# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Number: |
| | : | |
| | : | VIOLATIONS: |
| | : | |
| v. | : | Count One: |
| | : | 26 U.S.C. § 7201 |
| | : | (Tax Evasion) |
| | : | |
| ITALIA FEDERICI, | : | Count Two: |
| | : | 18 U.S.C. § 1505 |
| Defendant. | : | (Obstruction of U.S. Senate Proceedings) |

## PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America and the defendant, ITALIA FEDERICI, agree as follows:

1.     The defendant is competent to enter into this agreement and is pleading guilty freely and voluntarily without promise or benefit of any kind, other than contained herein, and without threats, force, intimidation, or coercion of any kind.

2.     The defendant knowingly, voluntarily, and truthfully admits the facts contained in the Factual Basis for the Plea (Attachment A), which is incorporated by reference herein.

3.     The defendant agrees to waive indictment by grand jury and plead guilty to the following charges contained in the Information:

| Count | Offense |
|---|---|
| One | Tax Evasion, 26 U.S.C. § 7201; and |
| Two | Obstruction of U.S. Senate Proceedings, 18 U.S.C. § 1505. |

The defendant admits that she is guilty of these crimes, and the defendant understands that she will be adjudicated guilty of these offenses if the Court accepts her guilty plea.

4.    The defendant understands the nature of the offenses to which she is pleading guilty, and the elements thereof, including the penalties provided by law.  The maximum penalty for violating the offenses specified in the Information is:

a.    Count One (Tax Evasion, 26 U.S.C. § 7201): 5 years of imprisonment; a $250,000 fine or not more than the greater of twice the gross gain or twice the gross loss; the costs of prosecution; and a mandatory special assessment of $100.

b.    Count Two (Obstruction of U.S. Senate Proceedings, 18 U.S.C. § 1505): 5 years of imprisonment; a $250,000 fine; and a mandatory special assessment of $100.

The defendant further understands that the Court will impose a term of supervised release to follow any incarceration, in accordance with 18 U.S.C. § 3583, and that, in this case, the authorized term of supervised release for each of the counts is not more than three years.  If the defendant violates the terms of her supervised release, then the defendant may be sentenced to not more than an additional two years of imprisonment.  Additionally, the defendant understands that the Court will impose restitution and that the Court may also impose the costs of incarceration, supervision, and prosecution.

5.    It is understood that restitution is due in the amount of $77,243 plus interest. Defendant will sign a restitution order agreeing that the defendant shall pay the Internal Revenue Service ("IRS") taxes due and owing for the calendar years 2001 through 2003 in the above amount.  Defendant agrees to pay the mandatory special assessment of $200 ($100 for each count of conviction) within ten (10) days of sentencing by cashier's check or certified check made

payable to "Clerk, United States District Court for the District of Columbia."  Defendant further

agrees that her payment of $77,243 plus interest, for her taxes due and owing for 2001 through

2003, as set forth above, does not compromise the IRS's ability to assess and collect civil taxes

and penalties, and she will cooperate and assist the IRS in any civil or administrative

proceedings; file any and all outstanding U.S. Individual Income Tax Returns due from her; and

pay outstanding taxes due and owing, on terms as agreed to with the IRS as a condition of

supervised release.

      6.      The defendant agrees the Court may order restitution to the IRS pursuant to

18 U.S.C. §§ 3663, 3664, and 3583.

      7.      If the Court accepts the defendant's plea of guilty, and the defendant fulfills each

of the terms and conditions of this agreement, the United States agrees that it will not further

prosecute the defendant for any crimes described in the Factual Basis for Plea.  Nothing in this

agreement is intended to provide any limitation of liability arising out of any acts of violence.

      8.      The defendant understands and agrees that Federal sentencing law requires the

Court to impose a sentence which is reasonable and that the Court must consider the advisory

United States Sentencing Guidelines ("Sentencing Guidelines" or "U.S.S.G.") in effect at the

time of the sentencing in determining a reasonable sentence.  Defendant also understands that

sentencing is within the discretion of the Court and that the Court is not bound by this agreement.

Defendant understands that the facts that determine the Total Offense Level will be found by the

Court at sentencing and that, in making those determinations, the Court may consider any reliable

evidence, including hearsay, as well as provisions or stipulations in this agreement.  Both parties

agree to recommend that the advisory Sentencing Guidelines should apply pursuant to United

States v. Booker, 543 U.S. 220 (2004), and its progeny, and that the final Sentencing Guidelines

range of imprisonment as calculated herein provides for a reasonable sentence. Defendant

further understands the obligation of the United States to provide to the United States Probation

Office all relevant information regarding the defendant, including charged and uncharged

criminal offenses.

9.      Except to the extent it would be inconsistent with other provisions of this

agreement, the United States and the defendant reserve, at the time of sentencing, the right of

allocution; that is, the right to describe to the Court fully, both orally and in writing, the nature,

seriousness, and impact of the defendant's conduct related to the charges against her or to any

factor lawfully pertinent to the sentence in this case. The United States will also advise the Court

of the nature, extent, and timing of the defendant's acceptance of responsibility. The defendant

further understands and agrees that in exercising this right, the United States may solicit and

make known the views of the law enforcement agencies which investigated this matter.

10.     The defendant and the United States agree that the following Sentencing

Guidelines factors, computation, and analysis applies to this case:

a.      The November 2005 Sentencing Guidelines Manual governs the

Guidelines calculations in this case. All references in this Agreement to the "Guidelines" or

"U.S.S.G." refer to the November 2005 Sentencing Guidelines Manual.

b.      The Base Offense Level for the Tax Offense (Count One: Tax Evasion,

26 U.S.C. § 7201) is 14, pursuant to U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(E). The Base Offense Level

for the Obstruction Offense (Count Two: Obstruction of U.S. Senate Proceedings,18 U.S.C.

§ 1505) is also 14, pursuant to U.S.S.G. § 2J1.2(a).

c.    The parties stipulate that the Tax Offense (Count One) and the Obstruction

Offense (Count Two) are "closely-related counts" and thus constitute one "Group" pursuant to

U.S.S.G. §§ 3D1.2(c), 3D1.3(a), and 3D1.4 (one unit; no increase in offense level), resulting in a

Combined Offense Level of 14.

d..    The defendant's sentence is determined as follows:

i.    Combined Offense Level ............................... 14

ii.    Anticipated Adjustment for Acceptance of Responsibility,
U.S.S.G. § 3E1.1(a) ................................... -2

iii.    Total Offense Level ................................... 12

Assuming a Criminal History Category of I, the Sentencing Guidelines range for a

Total Offense Level 12 is ................................... 10 to 16 months (Zone C)

e.    As indicated in the preceding paragraph, the United States agrees that

it will recommend that the Court reduce by two levels the Sentencing Guideline applicable to the

defendant's offense pursuant to U.S.S.G. § 3E1.1(b) ("Acceptance of Responsibility"), based

upon the defendant's recognition and affirmative and timely acceptance of personal

responsibility.  The United States and the defendant further agree that the United States will not

ask that the defendant be detained pending sentencing.  However, the United States will not be

required to make any recommendation specified herein if the defendant: (1) fails to admit

a complete factual basis for the plea at the time the defendant is sentenced or at any other time;

(2) challenges the factual basis for the guilty plea at any time after the plea is entered; (3) denies

involvement in the offense; (4) gives conflicting statements about that involvement or is

untruthful with the Court, the United States, or the Probation Office; (5) fails to give complete

and accurate information about the defendant's financial status to the Probation Office;

(6) obstructs or attempts to obstruct justice prior to sentencing; (7) has engaged in conduct prior

to signing this plea agreement which reasonably could be viewed as obstruction or an attempt to

obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing

this plea agreement; (8) fails to appear in court as required; (9) after signing this plea agreement,

engages in additional criminal conduct; or (10) attempts to withdraw her plea of guilty. If the

United States does not recommend a reduction under Section 3E1.1(b), then the United States

may recommend any sentence within the range for a Total Offense Level 14, subject to the

provisions set forth in Paragraph 11 below.

       f.      The defendant understands that her Criminal History Category will be

determined by the Court after the completion of a Pre-Sentence Investigation by the Probation

Office. The defendant acknowledges that the United States has not promised or agreed that the

defendant will or will not fall within any particular Criminal History Category and that such

determinations could affect her Sentencing Guidelines range and/or offense level as well as her

final sentence.

     11.    The parties agree that the defendant may seek and advocate for a departure or

variance pursuant to 18 U.S.C. § 3553, provided that the Sentencing Guidelines applicable to the

defendant are calculated as set forth above in Paragraph 10, or are higher. The United States

reserves the right to object to any such request. Moreover, the United States agrees that it will

not seek or advocate for a departure or variance, provided that the Sentencing Guidelines

applicable to the defendant are calculated as set forth above in Paragraph 10. If the defendant

fails to comply with any of the terms and conditions set forth in this agreement, the United States

may move for enhancements or upward departures or variances based on any grounds the United States deems appropriate.

12.     The parties agree that U.S.S.G. § 5E1.2(a) provides that the Court shall impose a fine, unless the Court finds that the defendant is unable to pay a fine.  Pursuant to the Fine Table contained in U.S.S.G. § 5E1.2(c)(3), an Offense Level of 12 provides a fine range of between $3,000 and $30,000.

13.     The United States cannot and does not make any promise or representation as to what sentence the defendant will receive or what fine or restitution the defendant may be ordered to pay.  The defendant understands that the sentence in this case will be determined solely by the Court, with the assistance of the United States Probation Office, and that the Court may impose the maximum sentence permitted by the law.  The Court is not obligated to follow the recommendations of either party at the time of sentencing.  The defendant will not be permitted to withdraw her guilty plea regardless of the sentence recommended by the Probation Office or the sentence imposed by the Court.

14.     The defendant agrees to cooperate fully in this and any other case or investigation with attorneys and investigators for the United States by providing truthful and complete information, evidence, and testimony, if required, concerning any matter.  The defendant understands that if she makes material false statements intentionally to law enforcement, commits perjury, suborns perjury, obstructs justice, or commits any other crime, she may be found to have breached this agreement, and nothing in this agreement precludes the United States of America or any other law enforcement authority from prosecuting her fully for those crimes or any other crimes of which she may be guilty and from using any of her sworn or unsworn

statements against her. The defendant understands that this plea agreement is explicitly dependent upon her providing completely truthful testimony in any trial or other proceeding, whether called as a witness by the United States, the defense, or the Court.

15.    Further, in the event that the United States determines in its exclusive discretion that the defendant has fully complied with this agreement and provided "substantial assistance" to attorneys and investigators for the United States in the investigation and prosecution of others, the United States agrees it will file a motion for a downward departure pursuant to U.S.S.G. § 5K1.1. Such assistance by the defendant shall include her cooperation in providing truthful and complete testimony before any grand jury and at any trial or hearing as requested by the United States and in interviews by attorneys and investigators for the United States. If the United States files a motion under U.S.S.G. § 5K1.1, both parties will have the right to present facts regarding the defendant's cooperation in any judicial district and to argue for the extent of the departure that is appropriate based on the defendant's cooperation. However, the defendant further understands that the decision whether to depart, and the extent of any departure for substantial assistance, is the exclusive province of the Court, and that there is no representation by the Government as to what degree, if any, the Court will depart. Furthermore, it shall not be a basis to withdraw from the plea agreement if the Government does not make a motion for downward departure or the Court does not depart from the appropriate Guidelines range or mandatory minimum, or does not depart downward to the defendant's satisfaction.

16.    The defendant, knowing and understanding all of the facts set out herein, including the maximum possible penalty that could be imposed, and knowing and understanding her right to appeal her conviction and sentence as provided in 18 U.S.C. § 3742, and to challenge

the conviction and sentence in any post-conviction proceeding, including a proceeding under

28 U.S.C. § 2255, hereby expressly waives the right to appeal her conviction and/or any sentence

within the maximum provided in the statutes of conviction, or the manner in which that sentence

was determined and imposed, including on the grounds set forth in 18 U.S.C. § 3742, in

exchange for the concessions made by the United States in this plea agreement. This agreement

does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).

17.    If the defendant fails to comply with any of the terms and conditions set forth in

this agreement, the United States may fully prosecute the defendant on all criminal charges that

can be brought against the defendant. With respect to such a prosecution:

a.    The United States may use any statement that the defendant made pursuant

to previous proffer agreements or this agreement, including the statements made in the attached

factual basis and/or during the plea colloquy, or any leads derived therefrom, and the defendant

shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal

Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other Federal

Rule, that the defendant's statements pursuant to this agreement or any leads derived therefrom

should be suppressed or are inadmissible;

b.    The defendant waives any right to claim that evidence presented in such

prosecution is tainted by virtue of the statements the defendant has made; and

c.    The defendant waives any and all defenses based on the statute of

limitations with respect to any such prosecution that is not time-barred on the date that this

agreement is signed by the parties.

18.    If a dispute arises as to whether the defendant has knowingly committed any material breach of this agreement, and the United States chooses to exercise its rights under Paragraph 17, at the defendant's request, the matter shall be submitted to the Court for its determination at an appropriate proceeding.  At such a proceeding, the defendant's disclosures and documents shall be admissible, and the United States shall have the burden to establish the defendant's breach by a preponderance of the evidence.

19.    The parties agree that if the Court does not accept the defendant's plea of guilty, then this agreement will be null and void.

20.    The defendant understands that this agreement is binding only upon the Criminal Division and the Tax Division of the United States Department of Justice.  This agreement does not bind any other prosecutor's office or agency.  It also does not bar or compromise any civil or administrative claim pending or that may be made against defendant.

21.    This agreement and the attached Factual Basis for Plea constitute the entire agreement between the United States and the defendant.  No other promises, agreements, or representations exist or have been made to the defendant or the defendant's attorneys by the Department of Justice in connection with this case.  This agreement may be amended only by a writing signed by all parties.

FOR THE DEFENDANT:

Dated: June 5ᵗʰ, 2007

_____
ITALIA FEDERICI
Defendant

_____
JONATHAN N. ROSEN, Esq.
NOAM B. FISCHMAN, Esq.
Counsel for Defendant

FOR THE UNITED STATES:

Dated: June 5, 2007

WILLIAM M. WELCH, II
Chief
Public Integrity Section
United States Department of Justice
Criminal Division

BRUCE M. SALAD
Chief
Southern Criminal Enforcement Section
United States Department of Justice
Tax Division

_____
KARTIK K. RAMAN
Trial Attorney
Public Integrity Section

_____
KAREN E. KELLY
SUSAN H. VRAHORETIS
MARK F. DALY
Trial Attorneys
Criminal Enforcement Section

_____
ARMANDO O. BONILLA
Trial Attorney
Public Integrity Section

**ATTACHMENT A**

FACTUAL BASIS FOR THE PLEA
OF ITALIA FEDERICI

This statement is submitted to provide the Court with a factual basis for my plea of guilty

to the charges filed against me in this matter.

Introduction

1.    At all relevant times, the defendant, ITALIA FEDERICI, was the founder and

President of the Council of Republicans for Environmental Advocacy ("CREA"), a non-profit

organization originally founded in Colorado in 1997 as the "Coalition of Republicans for

Environmental Activists." After initially operating from proceeds FEDERICI received from an

inheritance, CREA thereafter operated primarily through donations.

2.    In 1998, FEDERICI relocated CREA to Washington, D.C., with the substantial

assistance of J. Steven Griles, who was then a Washington, D.C., lobbyist. Griles took an active

interest in CREA and thereafter assisted FEDERICI in raising funds for CREA. In 1998,

FEDERICI and Griles developed a close, personal relationship which lasted through 2004.

3.    CREA was formally incorporated in Washington, D.C., on September 14, 2000,

as an Internal Revenue Code Section 501(c)(4) organization. Since that time, CREA has also had

a vice president, whose responsibilities included overseeing CREA's day-to-day financial

management. Between March 2001 and May 2003, CREA received approximately $723,500

through donations and advocacy work.

Federici's Communications with Jack A. Abramoff and J. Steven Griles

4.    On March 8, 2001, Griles was nominated to be the Deputy Secretary of the

United States Department of the Interior ("DOI"), the Federal agency responsible for, among

other things, such Native American matters as tribal recognition, gaming compacts and

applications to place land into trust for gaming purposes, and distributing Federal program funds.

     5.     On March 1, 2001, one week before Griles' nomination, FEDERICI introduced

Griles to Jack A. Abramoff, a Washington, D.C., lobbyist whose client list included

Native American tribal governments operating, or interested in operating, gaming operations on

designated Federal land, and others seeking Federal recognition and program funds. Abramoff

also represented other entities subject to DOI oversight. At the time, Abramoff and his clients

had a substantial and recurring interest in decisions made by DOI and its officials. During this

meeting, the three discussed a variety of issues, including Griles' impending nomination,

Abramoff's interests in DOI issues and recommending colleagues for high-level DOI positions,

and CREA's funding.

     6.     Shortly after the above-described March 1, 2001 meeting, Abramoff, personally

and through his clients, became a substantial contributor to CREA. In fact, Abramoff and his

clients donated approximately $500,000 to CREA between March 2001 and May 2003.

     7.     Griles was confirmed by the United States Senate on July 12, 2001, and upon

being sworn in on July 17, 2001, served as the second-highest ranking official within DOI until

he resigned effective January 31, 2005. During much of Griles' tenure as DOI Deputy Secretary,

FEDERICI served as a conduit for information between Abramoff and Griles in order to foster

Abramoff's and his client's interests. In such a role, FEDERICI would communicate in-depth

with Abramoff about his clients and the issues and concerns applicable to Abramoff's clients,

and then communicate in-depth with Griles about these issues and/or forward to Griles white

papers and other information and documents Abramoff supplied. FEDERICI also met with

Abramoff and Griles in order to speak substantively and directly about these issues. FEDERICI admits that her involvement as a conduit between Abramoff and Griles hindered DOI's official record-keeping about Griles' contacts with lobbyists such as Abramoff and DOI's ability internally to measure the level of Abramoff's access to Griles.

8.      Griles was receptive to the above-described communications and took certain actions within DOI and/or provided Abramoff with advice and internal DOI information – both directly and through FEDERICI – on several issues pending before DOI that directly affected Abramoff's clients. The following list exemplifies some of the DOI issues about which FEDERICI, Abramoff, and Griles communicated in-depth between in or about March 2001 and May 2003, and where FEDERICI served as a conduit for information between Abramoff and Griles in order to foster Abramoff's and his clients' interests:

      A.      In March 2001, FEDERICI, Abramoff, and Griles discussed in-depth candidates for specific high-level DOI positions whom Abramoff recommended.

      B.      In September 2001, FEDERICI, Abramoff, and Griles planned and attended a CREA-sponsored dinner event at a private Washington, D.C., home which gave Abramoff and some of his Native American tribal clients the opportunity to meet and discuss their interests with select, high-ranking DOI officials.

      C.      In October 2001, FEDERICI, Abramoff, and Griles communicated in-depth about having Griles inquire into the status of DOI's alleged failure to release $1.3 million in appropriated funds earmarked as payment for a negotiated settlement the United States purportedly reached with one of Abramoff's clients, the Coushatta Tribe of Louisiana, in connection with a land dispute.

D.    In October 2001, Abramoff learned that the Republican candidate in the Commonwealth of the Northern Mariana Islands ("CNMI") governor's race was scheduled to meet with the then-DOI Secretary for a "photo-op." Abramoff believed that the candidate would use the meeting and photograph to suggest to voters that he had received the endorsement of the DOI Secretary and/or the Administration. FEDERICI, Abramoff, and Griles communicated in-depth about having the candidate's meeting with the DOI Secretary canceled. FEDERICI, Abramoff, and Griles also communicated in-depth about arranging a meeting with the DOI Secretary for another CNMI gubernatorial candidate, whom Abramoff supported.

E.    In mid-December 2002, FEDERICI, Abramoff, and Griles communicated in-depth about how to derail the land-into-trust application of the Match-e-be-nash-she-wish Band of Pottawatomi Indians (of Michigan) – commonly known as the Gun Lake Tribe. Abramoff's concern was that the location of the planned casino would harm the interests/market share of one of Abramoff's clients, the Saginaw Chippewa Indian Tribe (of Michigan), which already had a casino in the area.

F.    From in or about January 2002, through May 2003, FEDERICI, Abramoff, and Griles periodically communicated in-depth about how to prevent the Jena Band of Choctaw Indians ("Jena Band"), based in Louisiana, from placing land-into-trust for gaming purposes in Louisiana and Mississippi. Abramoff's concern was that two of his clients – the Coushatta Tribe of Louisiana and the Mississippi Band of Choctaw Indians – already operated casinos in the proposed sites of the Jena Band casino and he wanted to stifle competition.

G.    In January 2003, while Abramoff was considering whether to represent the Mashpee Wampanoag Tribe of Massachusetts in its quest to obtain tribal recognition from DOI, FEDERICI, Abramoff, and Griles communicated in-depth about how to win DOI recognition for the Tribe.

H.    In March/April 2003, FEDERICI, Abramoff, and Griles communicated in depth about how to overcome DOI's alleged refusal to release approximately $3 million in appropriated funds to Abramoff's client, the Saginaw Chippewa Indian Tribe (of Michigan), in connection with the Tribal School Construction Demonstration Program (a/k/a School Cost Share Program).

9.    In May 2003, FEDERICI decided that she no longer wished to serve as the conduit for information between Abramoff and Griles. Fearing that Abramoff would not take "no" for an answer, FEDERICI sought Griles' advice. Griles told FEDERICI to simply inform Abramoff that Griles was no longer dealing with Native American tribal matters at DOI. With that, Abramoff stopped communicating with FEDERICI and, concomitantly, both Abramoff and his clients stopped contributing to CREA.

CREA's Financial Operation and Business Practices

10.    FEDERICI and the other officer of CREA relied primarily on cash, including ATM transactions, to handle the finances of CREA. As a result, CREA failed to maintain proper financial books and records of its bank and business accounts. This extensive use and reliance on cash by CREA continued throughout the prosecution years of 2001-2003, despite admonitions to CREA from CREA's accountants who were engaged to prepare CREA's Forms 990.

11.    During the years 2001 through 2003, CREA was operated in such a manner that the personal finances of the officers and the finances of CREA were not properly segregated. In lieu of taking a regular salary, FEDERICI and CREA's vice president obtained funds from CREA by directly withdrawing cash from CREA's bank account through ATM and teller transactions. FEDERICI and the vice president also received checks from CREA.

12.    CREA's accountant issued Forms 1099 to FEDERICI and the vice president of CREA in an effort to account for the money the officers withdrew from CREA's bank accounts. The improper issuance of Forms 1099 to report compensation to officers, instead of Forms W-2 and payroll reporting, continued throughout the prosecution years despite the admonitions to CREA from CREA's accountant.

13.    For Tax Year 2001, $51,613 in income from CREA was reported to FEDERICI on a Form 1099.

14.    On or about April 15, 2002, a request for an extension of time within which to file the U.S. Individual Income Tax Return for 2001 was filed on behalf of FEDERICI, to extend the filing deadline for FEDERICI's 2001 tax return to August 15, 2002. FEDERICI did not include payment of taxes due and owing with the extension request as required by law.

15.    On or about August 15, 2002, FEDERICI willfully failed to timely file a U.S. Individual Income Tax Return, or pay the taxes due and owing, of $16,614.

16.    For Tax Year 2002, $92,201 in income from CREA was reported to FEDERICI on a Form 1099.

17.    On or about April 15, 2003, a request for an extension of time within which to file the U.S. Individual Income Tax Return for 2002 was filed on behalf of FEDERICI, to extend the

filing deadline for FEDERICI's 2002 tax return to August 15, 2003. FEDERICI did not include

payment of taxes due and owing with the extension request as required by law.

18.    On or about August 15, 2003, FEDERICI willfully failed to timely file a

U.S. Individual Income Tax Return, or pay the taxes due and owing, of $32,846.

19.    For Tax Year 2003, $90,145 in income from CREA was reported to FEDERICI

on a Form 1099.

20.    On or about April 15, 2004, a request for an extension of time within which to file

the U.S. Individual Income Tax Return for 2003 was filed on behalf of FEDERICI, to extend the

filing deadline for FEDERICI's 2003 tax return to August 15, 2004. FEDERICI did not include

payment of taxes due and owing with the extension request as required by law.

21.    On or about August 15, 2004, a second request for an extension of time within

which to file the U.S. Individual Income Tax Return for 2003 was filed on behalf of FEDERICI,

to extend the filing deadline for FEDERICI's 2003 tax return to October 15, 2004. FEDERICI

did not include payment of taxes due and owing with the extension request as required by law.

22.    On or about October 15, 2004, FEDERICI willfully failed to timely file a

U.S. Individual Income Tax Return, or pay the taxes due and owing, of $31,178.

23.    The total tax loss resulting from FEDERICI's willful evasion of U.S. Individual

Income Taxes for the Tax Years 2001 through 2003 is $77,243.

Federici's Obstruction of United States Senate Proceedings

24.    On October 7, 2005, Federici submitted to a voluntary interview conducted by

investigators for the United States Senate Committee on Indian Affairs ("Senate Committee"),

which was investigating allegations of misconduct by Abramoff and others made by several

Native American tribes. During the October 7, 2005 interview, the Senate investigators focused

on, among other things, the extent to which FEDERICI, Abramoff, and Griles communicated

about issues pending before DOI that directly affected Abramoff's clients while Griles served as

DOI Deputy Secretary. FEDERICI was aware of the scope of the Senate Committee's inquiry

prior to the commencement of her interview.

25.    During her October 7, 2005 Senate interview, in an effort to conceal her role as a

conduit for information between Abramoff and Griles while Griles served as DOI Deputy

Secretary, FEDERICI did not testify fully and truthfully when questioned by Senate investigators.

Instead, by way of example, when asked the following questions, and after being shown relevant

e-mail messages, FEDERICI gave the following answers, knowing the underscored declarations

to be materially false statements about the extent of the communications involving her,

Abramoff, and Griles:

Q:    With this e[-]mail in front of you, Italia [Federici], does this refresh
your recollection about any conversations you may have had with
Mr. Abramoff . . . during the period, about [the Tribal School Construction
Demonstration Program (a/k/a School Cost Share Program)]?

A:    No. No, and <u>to the best of my recollection I really didn't have a lot of
contact with Jack about this. This, I had no contact with him as far as I
can recall about . . . .</u>

* * *

Q:    To what extent are you aware or were you aware of any direct
communications that Mr. Abramoff had with Mr. Griles about his clients
[, the Saginaw Chippewa Indian Tribe (of Michigan), in connection with
the School Cost Share Program]?

A:    <u>I am not aware.</u>

* * *

Q:    . . . . Perhaps we can talk about a couple of other projects and with your best recollection if you [re]call tell me what Jack [Abramoff] told you about it, whether or not he'd asked you, to what exten[t] he asked you to talk to Mr. Griles about it and what, if anything, Mr. Griles did.

A:    About what?

Q:    About other projects regarding the Saginaw[]Chippewa. In particular, the Gun Lake Band of the Potowatomie?

A:    <u>I have no idea. To the best of my recollection, I never talked to Steve [Griles] about that . . . .</u>

* * *

26.    On November 17, 2005, FEDERICI testified in public hearings held before the Senate Committee in furtherance of the Senate Investigation. The then-Chairman and Vice Chairman of the Committee presided. Among other things, these Senators questioned FEDERICI about the extent of the communications involving her, Abramoff, and Griles while Griles served as DOI Deputy Secretary. The Senators also questioned Federici about CREA's financial operations and business practices.

27.    During her November 17, 2005 Senate testimony, in a further effort to conceal her role as a conduit for information between Abramoff and Griles while Griles served as DOI Deputy Secretary, FEDERICI did not testify fully and truthfully when questioned by the Senators. Instead, by way of example, when asked the following questions, and after being shown relevant e-mail messages, FEDERICI gave the following answers, knowing the underscored declarations to be materially false statements about the extent of the communication involving her, Abramoff, and Griles:

Q:    Did you ever provide documents to Mr. Griles that you received from
      Mr. Abramoff or his associates?

A:    <u>I cannot recall having given Mr. Griles documents</u>.  I mean, I might have
      shown him a newspaper article or something like that . . . .

Q:    But you do not recall if you ever provided any documents that were given to
      you by Mr. Abramoff or his associates to Mr. Griles?

A:    I recall newspaper articles, Senator. . . .

Q:    All that you did was provide newspaper articles, nothing more?

A:    <u>Not that I can recall</u>. . . .

28.    The underscored declarations identified above in Paragraphs 25 and 27 were
not true, as FEDERICI then and there well knew, for the reasons stated in Paragraphs 7 and 8.
These underscored declarations were material to the October 7, 2005 Senate interview, the
November 17, 2005 Senate hearing, and the ongoing Senate investigation into Abramoff and
others in that it was material that the Senators and Senate investigators who questioned
FEDERICI learned the truth about the extent to which FEDERICI, Abramoff, and Griles
communicated about DOI-related matters while Griles served as DOI Deputy Secretary.

29.    FEDERICI admits that the materially false and misleading statements and
testimony described herein may have or had the effect of, or were capable of, influencing the
Senate Committee's assessment of Griles' credibility overall and the following conclusions
drawn by the Senate Committee in its September 5, 2006 Final Report:

> Based on the information in its possession, the Committee cannot
> definitively conclude what, if anything, Griles did to assist Abramoff's clients on
> matters then pending at Interior.  In its totality, the information described above
> supports relatively modest propositions, namely, that Abramoff <u>believed</u> that he
> had influence over Griles, either directly or through Federici; that Abramoff
> told others that he had a robust relationship with Griles or had some influence

over decision-making at Interior; and that it was likely on that basis that he may have directed his Tribal clients to "contribute" to CREA. However, it must be carefully said that, without more evidence, it is plausible that, in fact relying on his relationship with Federici, Abramoff may have simply exaggerated his access to Griles to his clients.

In any event, given the paucity of evidence in the Committee's possession, the Committee is unable to arrive at any definitive conclusions as to the veracity of Griles' testimony on his relationship, and interaction, with Abramoff during all times relevant. And, without a good faith basis for concern that Griles may have been untruthful with the Committee, further exploration is beyond the scope of the investigation. . . .

***

. . . Unfortunately, the extent to which Federici actually sought to influence Interior on pending matters affecting Abramoff's clients remains unclear. Also unclear is what, if anything, Griles (who Abramoff believed was Federici's contact at Interior) might have done on behalf of Abramoff's clients at Interior and (if Griles did anything) what his motives for doing so might have been.

"Gimme Five" – Investigation of Tribal Lobbying Matters, S. Rep. No. 109-325, at 244-45

(2006) (Final Report Before the United States Senate Committee on Indian Affairs (emphasis in

original). Federici also admits that had she been truthful in her October 7, 2005 Senate interview

and her November 17, 2005 Senate testimony, the Committee may have explored further and

found that Griles was untruthful and that Abramoff was, in fact, lobbying Griles through

Federici.

The preceding statement is a summary, made for the purpose of providing the Court

with a factual basis for my guilty plea to the charges filed in the criminal Information against me.

I am competent to make this statement and I do so knowingly and voluntarily and because I am

in fact guilty of the crimes charged. I have discussed this factual basis with my attorneys, and

I understand that this statement is admissible as evidence against me if I fail to comply with the

plea agreement.


Dated: June 5, 2007

FOR ITALIA FEDERICI:


ITALIA FEDERICI
Defendant

JONATHAN N. ROSEN, Esq.
NOAM B. FISCHMAN, Esq.
Counsel for ITALIA FEDERICI