## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:07-CR-145 (ESH) |
| | : | |
| ITALIA FEDERICI, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

### DEFENDANT ITALIA FEDERICI'S
### MEMORANDUM IN AID OF SENTENCING

In accordance with this Court's order of June 8, 2007, Defendant Italia Federici, by counsel, respectfully submits this Memorandum in Aid of Sentencing. Ms. Federici and the Government agree that a sentence of incarceration is not warranted in light of Ms. Federici's substantial assistance in the Government's investigation and prosecution of others implicated in and through the Jack Abramoff investigation. In its Substantial Assistance Memorandum ("Government's Memorandum"), the Government requested a 3-level reduction in Ms. Federici's offense level. Additionally, Ms. Federici's good character, sincere remorse, role as a subordinate to others, and the harsh consequences she has already incurred - among the key sentencing factors the Court considers under 18 U.S.C. § 3553(a) - weigh heavily against any sentence of incarceration. In light of Ms. Federici's substantial and timely assistance, and these § 3553 factors, we respectfully request that the Court sentence Ms. Federici to a term of probation.

## I. INTRODUCTION

In March 1996, Italia Federici spoke with her mother, Pauline Mullan, a school teacher and children's librarian who was dying of cancer. Then an aide to Secretary Norton's Senate campaign, Ms. Federici and her mother discussed the Senate campaign and the public perception

that Republicans were anti-environment and anti-arts.  Ms. Federici received her mother's blessing to establish an environmental non-profit.

Approximately five months later, Ms. Mullan died, see PSR at ¶ 74, and Ms. Federici received an inheritance from her mother.  Ms. Federici could have spent that inheritance on any number of mundane, material purchases.  Instead, Ms. Federici honored her mother's memory by starting the non-profit that they had recently discussed.  See PSR at ¶11.

In 1997 in Colorado, with Ms. Federici's sole financial assistance, CREA was conceived as an organization intended to help at-risk children learn about the environment.  From its inception, Gale Norton served as CREA's National Chairman.  Despite Ms. Federici's initial plans, on the advice of others, the educational mission of CREA changed:  in lieu of a Colorado-based organization focused on underprivileged children, CREA became a Washington, D.C.-based organization dedicated to educating members of Congress.  Consistent with CREA's revised mission, in early 1999, Ms. Federici left her home in Colorado to reestablish CREA in Washington D.C.  See PSR at ¶ 12.

CREA's move to Washington D.C. had been, in part, the idea of J. Stevens Griles, then a lobbyist who would later become a public official.  Ms. Federici had been introduced to Mr. Griles by then-Attorney General Norton.  Then-Attorney General Norton and Mr. Griles had known each other for many years and considered him to be a close and trusted friend.  See Tab 1.  Then-Attorney General Norton asked Ms. Federici to include Mr. Griles on CREA's Advisory Committee and to rely on him for advice and counsel.  Once in Washington, D.C., Ms. Federici met Jack Abramoff.  By Winter 2004, Mr. Abramoff's corrupt relationship with others, including Mr. Griles, attracted scrutiny from the national media, the United States Senate, and the United

States Department of Justice. The investigations were massive and far reaching, implicating not only Mr. Abramoff, but also Congressmen, executive branch officials and lobbyists.

As Ms. Federici now deeply regrets, she minimized the nature and extent of her contacts with Mr. Abramoff and Mr. Griles, thereby obstructing the Senate's investigation of Mr. Abramoff. Moreover, Ms. Federici also deeply regrets her failure to pay her personal income taxes from 2001 through 2003.

But her misconduct, while inexcusable, betrays Ms. Federici's general intentions with respect to the Government's investigation. In February 2005, before the antagonistic glare of the Senate proceeding, Ms. Federici was interviewed by the Department of Justice, her first contact with the Government on this matter. During that conversation, we respectfully believe, Ms. Federici was the first person in the Abramoff investigation to volunteer to the Government that she and Mr. Griles had once dated and that she had introduced Mr. Abramoff to Mr. Griles. These very same facts later resurfaced as material admissions in the plea documents of Mr. Griles, see Griles Statement of Facts, ¶ 5, at Tab 2, and we respectfully believe that these facts were part of Mr. Abramoff's plea documents as well.

Ms. Federici's missteps also betray her general intentions with respect to CREA. CREA was, and always had been, a bona fide organization that incurred legitimate expenses. Ms. Federici actually lost money as a result of her loan to CREA at its inception. Ms. Federici conscientiously did not establish a 501(c)(3), which, in contrast to a 501(c)(4), would have been eligible to receive tax-deductible contributions. Ms. Federici's forbearance reflects her preference for CREA's integrity over CREA's fundraising. Ms. Federici retained and paid significant fees for a qualified lawyer to serve as general counsel. See Ginsberg Letter, at Tab 3. Mr. Ginsberg writes in this regard, "… Ms. Federici actively solicited my advice to discern the

lawful extent of CREA's issue advocacy ...," seeking to ensure that CREA's advocacy was, at all times, consistent with federal law. Id. Similarly, Ms. Federici conducted significant due diligence in selecting an outside auditor to help manage CREA's finances. In particular, Ms. Federici relied on the recommendation of a prominent leader of a nationally recognized high-profile 501(c)(4) in selecting Halt, Buzas & Powell, LTD, a highly regarded accounting firm, to serve as CREA's outside auditor. Ms. Federici partnered with Jared Carpenter, who assumed the position of Vice President and whose responsibilities included overseeing CREA's day-to-day financial management. See PSR at ¶13. This delineation of responsibilities was clear to those who worked closely with CREA, including Mr. Ginsberg. See Ginsberg Letter, at Tab 3. As more fully discussed below, Ms. Federici's use of internal controls at CREA reflected her intent to create a credible and effective organization. See Ginsberg Letter, at Tab 3.

Perhaps most importantly, Ms. Federici's missteps betray her own values and character. Because of Ms. Federici's enthusiasm and activism for environmental issues, CREA became a credible entity with a substantive and highly regarded track record for environmental advocacy. Her loyalty to CREA's mission caused her to eschew more lucrative jobs in the private sector as a lobbyist or more prestigious jobs in the Bush Administration. See Baise Letter, Biersack Letter, Dendahl Letter, Langer Letter, and Larsin Letter, at Tab 3. Ms. Federici's involvement in CREA was animated by a sincere intent to make a difference - not self-aggrandizement. Moreover, wholly independent of her involvement in CREA, Ms. Federici's conduct in this case betrays her character as a "selfless" individual on whom her friends have consistently depended. See Langer Letter, Larsin Letter, Querard Letter, and Wadsworth Letter, at Tab 3. The woman who repeatedly checked in on a friend's elderly grandparent in New York City and who engaged in grass roots advocacy to correct serious public health and safety concerns in her local

residential community provides a far more accurate image of Ms. Federici's character than anything that this investigation has exposed. See id.; see also Letter from The Honorable Dorothy Miller, Page Letter, and Wheeler Letter, at Tab 3.

Consistent with her good character, Ms. Federici stands before this Court to accept full responsibility for her crimes. Ms. Federici's total and unequivocal acceptance of responsibility is reflected in the plea agreement itself. This is not the narrowly tailored plea of a defendant who remains unwilling to embrace the truth. Ms. Federici has truthfully answered every question posed by the Government in their numerous debriefings with her before and after the plea hearing. See Government's Memorandum, p. 12. Ms. Federici has not minimized her involvement before the Government or the Court. Id., p. 13.

Ms. Federici's acceptance of responsibility is also reflected by her comprehensive cooperation with the Government. For example, Ms. Federici provided the Government with helpful information at the time of her first interview in May 2005. And Ms. Federici agreed to provide the Government with a broad and highly effective plea in this case. Indeed, "… given her expansive Factual Basis for Plea, no single individual was perhaps more important to Griles' sentencing hearing than Federici, making her cooperation both significant and useful." See Government's Memorandum, p. 14. In addition, Ms. Federici provided substantial and timely cooperation after her plea hearing, including more than one hundred hours of debriefings with prosecutors and federal agents investigating various related cases and targets. See Government's Memorandum, p. 12. Ms. Federici also provided documents to the investigators that they had otherwise been unable to find from any other source. Additionally, Ms. Federici's debriefing and plea preceded the felony conviction of Mr. Carpenter in Criminal Case No. 07-171 (ESH). In short, Ms. Federici's cooperation with the Government was timely, demanding, extensive, and

extremely valuable, facts that the Government has highlighted in its various pleadings before Court.

In light of Ms. Federici's extraordinary and valuable cooperation, her deep remorse and her charitable character, a sentence of incarceration would serve no purpose and, instead, discourage similarly situated offenders in the instant and other investigations from cooperating with the prosecutors in the future. For these reasons, and as discussed in more detail below, Ms. Federici requests that her sentence be a grant of probation.

## II. SENTENCING GUIDELINES CALCULATIONS

In the plea agreement, the Government and Ms. Federici agreed that her conduct results in an offense level of 12 under the Sentencing Guidelines. The Government and Ms. Federici also agreed to recommend an advisory sentencing range, before any § 5K1.1 reduction, consisting of 10 to 16 months of incarceration.[1/]

On December 11, 2007, the Department of Justice filed the Government's Memorandum, which requests that the Court substantially depart downward from the advisory Sentencing Guidelines. Consistent with the authority granted to the Court by the Government's 5K1.1 departure motion, supplemented by the § 3553 factors, Ms. Federici respectfully requests that the Court issue a sentence of a period of probation.

Ms. Federici has reviewed the Presentence Report ("PSR") prepared in this matter. Aside from the PSR's grouping analysis, Ms. Federici agrees with the information and recommendations contained in the PSR. With respect to the grouping issue, Ms. Federici hereby incorporates her objections and the Government's objections to the draft-presentence report, which are appended to the PSR for the Court's review. But Ms. Federici respectfully disagrees with the grouping argument contained in the Government's Memorandum to the extent that the

Government predicates its position on allegations that Ms. Federici lied to the Senate about her use of CREA's funds. We submit that such allegations are far broader than, and have no relation to, the charges to which Ms. Federici pled guilty and for which she accepts full responsibility.

Ms. Federici guided CREA to significant policy-oriented contributions, as demonstrated in greater detail below.

### III. SECTION 3553 FACTORS

In addition to the Sentencing Guidelines, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining the appropriate sentence. See United States v. Dorcely, 454 F.3d 366, 374 (D.C. Cir. 2006). The sentence must be adequate "but not greater than necessary" to comply with the relevant purposes and factors set forth in the statute. 18 U.S.C. § 3553(a). The principal section 3553 factors relevant to this case are Ms. Federici's personal history and characteristics, the nature and circumstances of the offense, the need for a just punishment, and the deterrence of criminal conduct. These factors demonstrate that incarcerating Ms. Federici would serve no worthwhile purpose. The Government's dual interests in appropriate punishment and effective deterrence are more than amply met without incarceration, as the Government agrees. Instead, the Court should sentence Ms. Federici to a term of probation so she may resume her productive role in society.

For the Court's information and assistance, Ms. Federici submits the attached letters from herself, her family members, friends, and former colleagues.

### A.    Ms. Federici's Background and Character

Italia Federici was born in Philadelphia, Pennsylivania on August 12, 1969, the oldest child of Pauline Mullan and Joseph Federici. Italia's sister, Helene, was born approximately seven years later. See PSR at ¶¶ 74, 78. The family was loving and Catholic. Joseph owned an

---

[1/]    Plea Agreement, ¶ 10(d).

agri-business.  Pauline, an early childhood development specialist with a Masters in Library Research Science, remained at home with Italia.  See PSR at ¶ 75.

At an early age, Italia was taught by her parents to treat individuals with dignity and respect.  Also at an early age, Italia developed an affection for those who serve the public interest.  When Italia was a very young child, her Aunt Helene worked for Senator Clifford Case.  As a result, Italia and her mother spent quite some time in D.C.  Italia often times accompanied Aunt Helene to work on Capitol Hill, playing in the Senator's office and lunching with her Aunt in the Senate dining room.  As a little girl, Italia grew up fondly thinking that Senators were caring and considerate individuals.  She developed a keen appreciation for Georgetown and Capitol Hill.

Italia's mother was diagnosed with Lupus when Italia was only two years old.  See PSR at ¶ 76.  At the time, Lupus was considered a terminal disease.  When, in 1977, Pauline's Lupus came out of remission, Italia and her family moved to Florida's West Coast, where her grandmother could help Italia's mother.  In the fourth grade, Italia's mother arranged for Italia to be tested for admission into a "gifted" program, a program in which Italia subsequently enrolled.  Additionally, Italia was drawn into activities like painting, drawing and photography.  Italia developed a passion for the environment at a very young age.

In the eighth grade, upon moving to Delray Beach, Italia and her sister attended Catholic school and participated in civic activities.  Italia played the guitar at Church each Wednesday and Sunday.  She won several art awards in high school and eventually received early admission to Penn State University, where she enrolled.

When Italia was 17, her father passed away.  When Italia was 20 and her sister, Helene, only 13, their mother was diagnosed with terminal cancer.  At the time, their mother was the

8

children's librarian for Palm Beach County.  In that capacity, their mother had earned accolades

for her stewardship of the local libraries, including a program whereby the Palm Beach Opera

Society performed truncated versions of fairy tales for kids at the library's main branch.  It was

at this time that Italia's mother expressed her desire that, in the event of her death, Italia become

the guardian for her 13-year-old sister.  To be closer to her mother and her sister, Italia

transferred to the University of Miami, where she continued with her undergraduate studies and

where she also attended to some of the household responsibilities.

With her treatment options in the United States dwindling, and intent on staying alive

until Helene finished high school, Italia's mother and Helene moved to Iceland, which was then

known for revolutionary treatment for cancer.  In Iceland, Italia's mother served as the children's

librarian for the NATO installation in Keflavik.  She also started a cancer group therapy in

Iceland – at the time, in Iceland, group therapy resources for cancer patients were not readily

available.  Italia visited her family in Iceland and worked for a period of time as a reporter for a

local television affiliate in Palm Beach, Florida.  Soon thereafter, Italia moved to Connecticut

where she lived with her Aunt Helene and Uncle David.

As her Aunt Helene has noted, this was a very stressful time in Italia's life.  See Matesky

Letter, at Tab 3.  Italia attended school, but the burdens of her mother's illness made studying

difficult.  Despite the strain, Italia showed her fortitude by working for various campaigns, first

Joseph Lieberman's campaign for United States Senate and then Jeb Bush's campaign for

Governor of Florida.  Eventually, in December 1994, Italia moved to Colorado, where her

friends Leilah Hayman and Jared Carpenter were living.  Italia's fortitude and grace in dealing

with her difficulties impressed some of her closest friends and colleagues.  See Agler Letter and

Querard Letter, at Tab 3.

During her time in Colorado, Italia worked for the Gale Norton for U.S. Senate campaign. Italia began by managing the scheduling for the campaign, but she quickly received many promotions. Soon, Italia took charge of the campaign's effort to organize the county assemblies to qualify the candidate for the Colorado ballot. Italia eventually assumed even greater campaign responsibilities after Norton's deputy campaign manager left the campaign. See Adkins Letter, Agler Letter, and Gifford Letter, at Tab 3.

The death of Italia's mother in July 1996 was a tragic, yet watershed, moment for Italia. Inspired by her mother's lifetime of service on behalf of others, Italia decided to honor her mother's memory by making a contribution to the not-for-profit community. Italia focused her idealistic ambitions on her two primary interests that she had developed during childhood: the environment and the arts.

In addition to establishing CREA, Italia founded the Republican Patron of the Arts ("RPA"), a Denver-based charitable organization that aimed to match Republican donations of musical instruments and artistic supplies to kids who could not otherwise afford instruction. Under Italia's leadership, the group formed a national Advisory Committee, which included then Senator Ben Nighthorse Campbell, then-Attorney General Gale Norton, and other prominent Republicans. In Spring 1997, also under Italia's leadership, the Republican Patron of the Arts sponsored a performance of "Show Boat" at the Denver Center for Performing Arts for underprivileged and at-risk middle and high school children. In addition to the musical, these children also enjoyed a tour of the Denver Performing Arts Complex. RPA also sponsored a dinner reception for them and their families, which was attended by Senator Campbell and other Republican leaders.

Energized with a dedication to her mother's memory, Ms. Federici seemed poised to make a meaningful contribution towards the betterment of others.

## B.    The Nature and Circumstances of the Offense

In respectfully urging this Court not to order Ms. Federici's incarceration, we underscore the following unique circumstances of this offense: (1) Ms. Federici's significant public service in the not-for-profit community; (2) her unwise alliances with others to pursue the objectives of her environmental advocacy; and (3) her efforts to extricate herself from her misguided relationships and circumstances, which are at issue in this case. These facts, of course, do not excuse Ms. Federici's misconduct, but they help explain how Ms. Federici's good intentions went awry.

### (1) Public Service

Ms. Federici sincerely intended to improve the lives of others through her not-for-profit advocacy. Towards that end, Ms. Federici always intended that CREA be a model corporate citizen. From its inception in Colorado, CREA maintained a sophisticated Board of Directors. Ms. Federici retained Mr. Ginsberg's firm to assist her with incorporating CREA, and, again, in 1999 to reorganize CREA into a 501(c)(4) organization. See Ginsberg Letter, at Tab 3. Ms. Federici's decision to organize CREA in 1999 was particularly telling of her attitude towards the organization compliance with the law. Sensitive that CREA's activities might, at times, be considered lobbying activities, Ms. Federici opted to structure it as a 501(c)(4) organization, rather than a 501(c)(3), despite the significant fundraising obstacles that 501(c)(4) organizations face as compared to their (c)(3) counterparts.

Ms. Federici also routinely consulted Mr. Ginsberg, during his extended tenure as CREA general counsel, about day-to-day advocacy issues pertaining to advertisements, handouts,

11

polling, scripts, and fundraising rules. See Ginsberg Letter, at Tab 3. With respect to financial management and book-keeping matters, CREA's Vice President, Jared Carpenter, was solely responsible for the financial management of the organization. See id. Through Mr. Carpenter, CREA routinely sought the advice of outside accountants whom CREA had retained to review CREA's finances.

With respect to CREA's advocacy, despite its comparatively small budget and staff, Ms. Federici worked tirelessly to build CREA into a bona fide public interest organization. She succeeded. Months after its incorporation, CREA held its first annual dinner on June 10, 1998. More than one hundred Members of Congress joined the Host Committee. It was an exceptionally successful event that permitted CREA to broadcast widely its organizational initiatives and to create momentum in conducting fundraising from a wide-variety of sources. In these early days of CREA, Ms. Federici took pains to seek the input of highly regarded environmental experts, and benefited from the decision of noted conservationists to join CREA's Board of Directors. Seemingly fighting against long odds – founding CREA with an inheritance and without a critical mass of staff – Ms. Federici was steering CREA to considerable successes.

Soon thereafter, Ms. Federici received advice from a number of trusted advisors, including Mr. Griles, to relocate CREA from Colorado to Washington, D.C. After much commuting back and forth to Colorado from the District, in 1999, Ms. Federici finally relocated here.

Ms. Federici's environmental advocacy burgeoned as a result, and CREA evolved into an invaluable clearinghouse for information about the environment for the public and for Members of Congress. For example, Congressional committees and other public officials sought CREA's position on issues related to environmental legislation. See Howard Letter, at Tab 3. Over a

period of time beginning March 2001, the House Energy and Commerce Committee requested

opinions from CREA regarding the Kyoto Protocol. Ms. Federici wrote a counter to the Kyoto

Protocol, which promoted an initiative to reduce greenhouse gas emissions called the

"Environmental Peace Corps." Ms. Federici frequently issued press statements praising or

admonishing legislative initiatives on Capitol Hill, including extremely successful grassroots

lobbying against a Senate Bill called the "Climate Stewardship Act of 2003." Under Ms.

Federici's leadership, CREA also sponsored bipartisan and highly effective briefings on Capitol

Hill for Members of Congress. See Biersack Letter, at Tab 3. She also organized "mini-think-

tank events attended by members from the Administration, Congress and the corporate world to

discuss general environmental issues." See id., see also O'Keefe Letter and Wheeler Letter, at

Tab 3.

> To address its enhanced demand for advocacy, Ms. Federici helped CREA develop an

extensive media and public relations operation. See Biersack Letter, at Tab 3. CREA's

advocacy regularly appeared in the print, television, and radio media. For example, Ms. Federici

and other CREA advisors have been widely interviewed and quoted in national media, including

CNN, UPI, NPR, AP, New York Times, Wall Street Journal, and in trade publications like

Greenwire regarding pending environmental legislation. CREA sponsored advocacy-oriented

pieces in newspapers, including an advertisement in the Washington Post in early April 2002,

which was cited during the Energy Bill debate by both Republicans and Democrats on the floor

of the United States Senate. Additionally, Ms. Federici published opinion pieces in various

media, and CREA produced a widely-circulated annual report on the environmental

accomplishments of Republican Governors. CREA's public relations campaign, which was

national in scope, reached into Albuquerque in August 2004, where CREA was asked to provide

a conservative counterpoint to ongoing demonstrations against the Government's treatment of

the United States' national parks.  In locations including Los Angeles and New York City,

CREA also organized demonstrations aimed at countering the protests of those who disagreed

with President Bush's environmental agenda.  See Dendahl Letter, at Tab 3.

Because of the scope and depth of Ms. Federici's reach, CREA became an organization

that gained the respect of prominent national leaders and organizations.  In addition to

individuals, highly regarded organizations sought alliances with Ms. Federici and CREA.  For

example, in April 2003, after much effort by Ms. Federici, CREA paired up with the

International Brotherhood of Teamsters to form the Labor Environment Alliance ("LEA"),

whose mission was to promote the economic benefits of a clear environment.  See O'Keefe

Letter, at Tab 3; see also Tab 5.  This coalition eventually lobbied on behalf of proposals such as

President Bush's then-pending Clear Skies Initiative and several other key domestic energy

proposals.  Moreover, CREA had a presence and hosted events at both the Republican National

Convention in 2000 and 2004.  CREA's convention event in 2000 featured Republican State

Environmental Secretaries from across the country, and its 2004 convention was headlined by

Secretary Norton, Michael Levitt, Administrator of the EPA, Conrad Lautenbacher,

Undersecretary of Commerce for Oceans and Atmosphere, and Jim Mosely, the Undersecretary

of the United States Department of Agriculture.

CREA's success transcended any single sector and any category of beneficiaries.

Correspondingly, CREA received funds from a vibrant and diverse group of donors.

In short, with Ms. Federici's active involvement, CREA became a credible entity with a

substantive and highly regarded track record of environmental advocacy.  Her loyalty to CREA's

mission caused her to forego better paying jobs as a lobbyist or more prestigious jobs with the

Government. Her dedication, work ethic, trustworthiness and honesty inspired the confidence of her many colleagues. See O'Keefe Letter and Wheeler Letter, at Tab 3. According to a colleague, Ms. Federici "adhered to the highest standards, not just a minimalist approach to compliance." See Smith Letter, at Tab 3. Ms. Federici's active and ethical involvement in CREA was motivated by her sincere intent to make a difference.

(2) Unwise Alliances

Ms. Federici's sincere interest in CREA's mission directly led to her initially well-intentioned, though misguided, alliances with Mr. Abramoff and Mr. Griles. Moreover, her near exclusive focus on CREA's advocacy also led to her reliance on Mr. Carpenter, who mismanaged CREA's day-to-day finances.

When Ms. Federici first met Mr. Abramoff in August 2000,[2] she understood him to be a connected and highly credible Republican lobbyist. At the time of their introduction, each was pursuing a common environmental policy wholly independent of one another. Ms. Federici, via CREA, and Mr. Abramoff, via Arctic Power, were each lobbying for oil drilling in the Arctic National Wildlife Refuge ("ANWR").

Mr. Abramoff was not the first person to ask Ms. Federici to lobby the United States Department of the Interior ("DOI") on behalf of Native Americans. As with her position on ANWR, Ms. Federici's interest in marrying Native American causes with a conservative environmental agenda pre-dated her introduction to Mr. Abramoff. As early as 1998, then-Attorney General Norton enlisted Colorado Senator Ben Nighthorse Campbell and Ms. Federici's assistance in lobbying then-Interior Secretary Bruce Babbit about an issue affecting

---

[2] It is noteworthy that their introduction, which was completely haphazard, had nothing to do with Native Americans or CREA. On behalf of personal friends, Ms. Federici was asked to identify possible investors in a hotel in Antigua. Out of a sense of friendship and with no economic interest in the possible venture, Ms. Federici made

15

the socio-economic opportunities for Native American Tribes in the Florida Everglades. Aligned with Senator Campbell, Ms. Federici wrote to the Secretary of the Interior because DOI policies were negatively impacting the socioeconomic opportunities of the Native American community living within the Florida Everglades. See Tab 4. Thereafter, Ms. Federici continued to assert that certain environmental policies could threaten the Native American communities. In short, Ms. Federici firmly believed many of the interests of the Native American community were aligned with CREA's environmental mission.

Ms. Federici wrongly saw Mr. Abramoff as a credible ally on conservative Republican policies related to the environment. Mr. Abramoff relayed to Ms. Federici that there was a growing recognition within the Native American community that supporting one party was not an advantageous tactic, particularly where some were realizing that Democrats did not have the best environmental agenda for the Native American community. Mr. Abramoff specifically told Ms. Federici that his tribal clients were working with the GOP camp for economic and social reasons and they relied on him for advice about good projects and where to put their money. Ms. Federici never doubted that CREA, in fact, qualified as a worthy project whose conservative agenda was consistent with the needs of the Native American community.

For Ms. Federici, the legitimacy of her alliance with Mr. Abramoff was reinforced by her trust in Mr. Griles. In March 2001, Secretary Norton was confirmed as the Secretary of the DOI. As a celebratory gesture, Ms. Federici assembled a guest list for a cocktail party to honor Secretary Norton and her successful Senate confirmation. Mr. Abramoff, whom Secretary Norton had not previously met, was not aware of the event, but nonetheless had been asking Ms. Federici for an introduction to the Secretary. Ms. Federici invited Mr. Griles, who Ms. Federici

---

some inquiries. In particular, she was given the name of Jack Abramoff, whom she then called. Ms. Federici met with Mr. Abramoff who was intrigued but never committed to the project.

16

trusted as a CREA advisor from its start, to join Mr. Abramoff at the Hay Adams hotel for

breakfast. The purpose of this initial meeting between Mr. Abramoff and Mr. Griles was for Mr.

Griles to determine whether Mr. Abramoff was an appropriate person to be included among the

invitees for the March 2001 cocktail party. Mr. Griles quickly approved of Mr. Abramoff. Mr.

Griles also stated to Ms. Federici that DOI "ethics" personnel would also review the propriety of

the list of cocktail party invitees. Ultimately, for Ms. Federici, Mr. Abramoff's standing largely

hinged on this approval accorded by Mr. Griles and DOI ethics personnel.

Mr. Abramoff's attitude towards Ms. Federici and CREA varied. Over time, Mr.

Abramoff was increasingly hostile towards both – he could be harassing, threatening, and

ultimately deceiving. For example, Mr. Abramoff once alerted Ms. Federici about "conservative

anger" on a DOI policy involving the designation of a casino for the Jena tribe. To persuade Ms.

Federici of the merit of his argument, Mr. Abramoff showed Ms. Federici articles published

through the National Center for Public Policy Research. To avoid what Mr. Abramoff described

as the political fall-out that Mr. Abramoff impliedly threatened against Mr. Griles and Secretary

Norton, Ms. Federici eventually acquiesced to Mr. Abramoff's request by speaking to Mr. Griles.

Ms. Federici now understands that the purportedly "independent" articles, which Mr. Abramoff

convinced Ms. Federici to show to Mr. Griles, were actually funded by Mr. Abramoff himself.

Mr. Abramoff did not require any intermediary to communicate with Mr. Griles. In fact,

days after their introduction in March 2001, Mr. Abramoff and Mr. Griles were directly

corresponding via email. Mr. Griles also maintained a private fax on the credenza behind his

desk. With the assistance of Mr. Griles' personal assistant, Mr. Abramoff would send a

facsimile to Mr. Griles without a cover sheet at the private number on the fax machine. Ms.

Federici now understands this practice – circumventing DOI's record-keeping practices by

sending faxes to an independent fax machine in Mr. Griles' office – to be illegal and inappropriate. But at the time, Ms. Federici accepted the opinion of Hugo Teufel, a long time political ally of Secretary Norton and the then-Associate Solicitor for General Law at DOI, that this practice was appropriate and was consistent with how Mr. Teufel, himself, treated certain correspondence with Mr. Abramoff.

Ms. Federici's sincere interest in CREA's mission also led to her reliance on Mr. Carpenter. In August 2000, with the assistance of Mr. Ginsberg, Ms. Federici converted CREA from a 527 to a 501(c)(4). As a 501(c)(4), CREA was subject to certain limitations with respect to the use of its funds. The following division of responsibility between Ms. Federici and Mr. Carpenter thereby ensued: Ms. Federici managed CREA's advocacy and donor development while Mr. Carpenter had sole responsibility for CREA's day-to-day finances. For example, Mr. Carpenter signed CREA's Form 990s. Mr. Carpenter completed the financial paperwork and generally consulted with the outside auditor. As a result, CREA's many financial records of spread sheets and other accounting composites do not include any of Ms. Federici's work product.

Ms. Federici expected that Mr. Carpenter would navigate CREA's financial course with the same standards that Ms. Federici had been applying to the operational front. Unfortunately, while Ms. Federici was successful in her endeavor, Mr. Carpenter was mismanaging his. To avoid detection, Mr. Carpenter began lying to Ms. Federici and proceeded to disregard completely CREA's corporate structure. Ms. Federici did not question Mr. Carpenter when he represented to her that CREA's financial affairs were in order. She did not then suspect, as she understands now, that Mr. Carpenter was lying to her about CREA's finances, nor could she have known then, as she knows now, that Mr. Carpenter already owed the IRS money for his

own unpaid personal income taxes as early as 2001. Indeed, it was not until Mr. Carpenter filed

his Supplemental Memorandum in Aid of Sentencing in his related case that Ms. Federici

understood that Mr. Carpenter completely failed to file IRS form 1099s. Mr. Carpenter had

previously told Ms. Federici and CREA's tax counsel that those documents had been filed. See

Annand Letter, at Tab 3.

CREA's legitimate business expenses were often times paid by cash and/or other debit

card transactions. Given the mismanagement of CREA's day-to-day bookkeeping, receipts to

memorialize the purpose of each cash transaction were often times lacking. Ironically, to protect

against the appearance of impropriety, cash transactions without a receipt were reported as

income, thereby artificially inflating Ms. Federici's actual income received from CREA.

Despite CREA's financial mismanagement, the fact that Ms. Federici was receiving

taxable income from CREA was, in fact, disclosed to the Government. CREA's Form 990s,

which were consistently filed during the years in question, uniformly identify Ms. Federici's

taxable income. They also uniformly identify Ms. Federici's title as President, a position which

facially fails to qualify for a Form 1099 in lieu of a W-2. Moreover, Ms. Federici believed

incorrectly that Mr. Carpenter was filing Form 1099s, which consistently disclosed her taxable

income. Even the applications for automatic extension of time provided a reasonable

approximation of Ms. Federici's actual taxes owed.

Ultimately, however, Ms. Federici failed to fulfill a basic responsibility that fell to her

alone – the responsibility to file and pay her personal income taxes. Similarly, it was she, alone,

who testified before the Senate in a way that obstructed the Senate Committee on Indian Affairs'

investigation of Mr. Abramoff and his dealings. For these offenses, Ms. Federici fully accepts

responsibility.

### (3) Subsequent Conduct

Ms. Federici's sincere intent with respect to CREA's mission is further underscored by her efforts to extricate herself from her misguided relationships and circumstances.

In Summer 2003, before any hint of a Government investigation, Ms. Federici severed her relationship with Mr. Abramoff. With an ambitious agenda and lacking the critical staff support, CREA relied on Ms. Federici to attend to CREA's substantive agenda, including the complex logistical challenges of the then newly formed LEA. Mr. Abramoff's increasingly overbearing demeanor caused Ms. Federici to question Mr. Abramoff's motives at a time when Ms. Federici was focused on the success of the LEA. She thus severed her contacts with Mr. Abramoff. CREA's mission of environmental advocacy was paramount for Ms. Federici – she would not sacrifice LEA or CREA to mollify a particular donor.

In 2004, long before CREA was subpoenaed, Ms. Federici approached two separate lawyers to discuss the disposition of CREA hard drives per CREA's document retention policy. See Carter Letter and Ginsberg Letter, at Tab 3. At the time, CREA was not in possession of any subpoena. Each lawyer authorized Ms. Federici to proceed with CREA's document retention policy. Mr. Ginsberg directed Ms. Federici to print all files that related to matters involving Mr. Abramoff before engaging its document retention policy, and Ms. Federici complied with this advice. See Ginsberg Letter, at Tab 3. To avoid the appearance of any impropriety, Ms. Federici took that advice one step further – she retained CREA's hard drives for future inspection, which, in fact, subsequently occurred at the Government's request.

Also before CREA received a subpoena from any investigating authority, Ms. Federici also started to take action with respect to the financial issues she was then only beginning to understand. In September 2004, when Ms. Federici learned that CREA was late with filing its

20

990s, Ms. Federici began questioning Mr. Carpenter's handling of CREA's finances. She immediately commenced a meeting to inquire not only about the 990s, but the propriety of CREA's finances generally. Unfortunately, this realization came far too late. Subpoenas soon issued from investigating agencies. As a part of the process of responding to these subpoenas, Ms. Federici also learned that CREA had been improperly issuing 1099s in lieu of W-2s, and it was as a result of this inquiry that Ms. Federici terminated CREA's outside accountant and auditor and hired a tax specialist, Robert Annand. Ms. Federici empowered Mr. Annand with the mandate to investigate and correct whatever paperwork irregularities may have existed. Towards that end, Ms. Federici directed her tax attorney to file the proper IRS Form1040s documenting her taxable incomes during the years at issue in this case. Thereafter, Ms. Federici filed her IRS Form 1040s with full knowledge that any concession by her of a tax due and owing could, in fact, be used against her.

In Spring 2006, Ms. Federici received notification from the IRS that she had an overdue tax balance. Ms. Federici, acting against the advice of her tax counsel, immediately contacted the IRS to arrange for a payment plan. These payments continued for four months, until December 2006, when Ms. Federici was no longer capable of continuing with her payment plan. But it was Ms. Federici's quick and decisive actions to begin repaying her past taxes, even in the face of advice to the contrary, that provides the Court with the proper snapshot of Ms. Federici's character.[3/]

C.    Just Punishment in Light of Ms. Federici's Substantial Assistance

As detailed in the Government's Memorandum, Ms. Federici actively cooperated with the Government over the course of a very important time period in the investigation of Mr. Griles and others. As the Government has noted for the Court, Ms. Federici's cooperation was

crucial to this Court's sentencing of Mr. Griles. See Government's Memorandum, pp. 11-12. The Government notes that, without Ms. Federici's cooperation, this Court would likely have been without crucial facts that it used to determine that Mr. Griles continued to minimize his own misdeeds even while standing before this Court at sentencing. See id. The Government states, "[w]e further believe that the admissions contained in Federici's Factual Basis for Plea, as well as what Federici described at length for us before Griles' sentencing hearing, played a significant role in the Court's eventual decision to double the prison term contemplated in Griles' plea agreement." See Government's Memorandum, p. 11. In short, Ms. Federici's cooperation limited Mr. Griles' ability to challenge the Government's allocution for a term of incarceration. Ms. Federici's cooperation helped to ensure that Mr. Griles was, in fact, held fully accountable for his abuse of authority as a public official. We respectfully submit that Ms. Federici's cooperation was immensely valuable to the Government and to this Court.

Ms. Federici's cooperation also preceded the filing of the Criminal Information in United States v. Jared Carpenter, Criminal Case No. 07-171 (ESH). In fact, Ms. Federici was the first subject in that tax investigation to cooperate with the Government. Her cooperation and plea likely influenced Mr. Carpenter's ultimate decision to plead guilty.

Ms. Federici's cooperation has been extensive both in duration and in scope. She has spent more than one hundred hours (indeed, more than one hundred and twenty hours) over the course of the past several months cooperating with the Government, first, with its preparation for Mr. Griles' sentencing, and, later, helping investigators advance many other investigations. She answered investigators patiently, and she followed-up on those questions independently when asked to do so. At the request of investigators, she searched for documents both in boxes and electronically. She has provided information to the Government that it could not have obtained

---

[3/]    Ms. Federici has agreed to sign a consent order to pay restitution in this case.

from any other source. Crucially, she created files for the agents pertinent to their investigations. She waived attorney-client privilege with respect to certain documents when asked to do so by the Government. Alone, separate and apart from investigators and any official "hours log" for her cooperation, she spent hours upon hours exploring the depths of her recollection. Ms. Federici has done all of the above because of her sincere interest in taking responsibility for her mistakes and helping the Government in its endeavor to investigate related matters.

Indeed, Ms. Federici has been consumed with cooperating these past months. Since her plea hearing more than six months ago, Ms. Federici has delayed moving forward with her personal and professional life because she understands the importance of information she can provide investigators with respect to ongoing investigations. Ms. Federici made decisions based on a sincere desire to avoid creating any obstacles to her full and complete cooperation with federal investigators. As the Court has seen through the Government's Memorandum, Ms. Federici has succeeded.

In light of her extraordinary cooperation, we respectfully submit that a term of probation is an adequate and just punishment for Ms. Federici's crimes. In addition, we ask that the Court consider Ms. Federici's present economic circumstances in considering whether to issue a fine.

D.    Deterrence

In a case followed closely by the media, Ms. Federici pled guilty to two serious felonies with a significant up-front guidelines range before the application of any section 5K1.1 departure. Her guilty plea alone therefore carried a significant - and adequate - deterrent message to the wider community. Indeed, the direct and collateral consequences of this plea send a powerful message to others: Ms. Federici has lost her job and will now carry these felonies for the rest of her life. Thus, we respectfully submit, a sentence of incarceration would

23

be "greater than necessary" to provide the general deterrent message under the statute. See 18 U.S.C. § 3553(a).

Moreover, the fact of two felony convictions is, itself, greater punishment and provides greater deterrence than Ms. Federici's counsel has zealously, but unsuccessfully, urged the Government to pursue. The fact of a second conviction for tax evasion serves as adequate punishment for Ms. Federici's failure to pay her taxes.

Ms. Federici is not a risk to recidivate. The non-profit that she founded in the memory of her mother has ceased to be viable. She has lost her right to vote, which is a particularly poignant penalty given Ms. Federici's background. She has incurred significant legal debts. Ms. Federici, however, is resilient, and, with the Court's help, will persevere. The lessons that she carries will stay with her for the rest of her life and will, thereby, serve to deter her from committing future crimes.

## IV. CONCLUSION

Ms. Federici has apologized for her conduct in her attached letter to the Court. She also looks forward to voicing her regret directly to the Court.

Ms. Federici stands before the Court as a humbled but resilient individual. During the course of this matter, despite her near constant attention to fulfilling the requests of the Government, Ms. Federici was commissioned and authored two substantial articles published in various media in the past six months. Moreover, Ms. Federici has been commissioned to author, and has begun work on, an academic white paper to be published in March 2008.

In light of her personal background and character, the severe punishments she has already endured, her sincere remorse, and the substantial assistance she has provided to the Government, Ms. Federici respectfully requests that the Court sentence her to a period of probation. Such a

sentence would permit Ms. Federici to realize the promise that her intellect, enthusiasm, and good heart continue to hold for all of us.

/s/
_____

Jonathan N. Rosen (Bar No. 503006)
Noam B. Fischman (Bar No. 469397)
MINTZ LEVIN COHN FERRIS
    GLOVSKY AND POPEO, PC
701 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 434-7300
(202) 434-7400 (facsimile)

Bridget Rohde (Bar No. 438449)
MINTZ LEVIN COHN FERRIS
    GLOVSKY AND POPEO, PC
Chrysler Center
666 Third Avenue
New York, NY 10017
(212) 935-3000
(212) 983-3115 (facsimile)

*Counsel for Italia Federici*

## CERTIFICATE OF SERVICE

I, Noam B. Fischman, hereby certify that on this the 12th day of December, 2007, a true copy of this document was served on all counsel of record by the CM/ECF system

<u>  /s/</u>
Noam B. Fischman

GALE A. NORTON

Judge Ellen Segal Huvelle
United States District Court
 For the District of Columbia
c/o Barry M. Hartman and
 Brian W. Stolarz
K&L Gates
1601 K Street, N.W.
Washington, D.C. 20006

      Re:   J. Steven Griles

Dear Judge Huvelle:

     My name is Gale A. Norton, former Secretary of the Interior. I am writing today in support of J. Steven Griles, who is to be sentenced before you on June 26, 2007. I am writing to present the Court with my views of Steve Griles' character and integrity. Although the current situation is unfortunate, it is only a small part of a distinguished career of private sector employment and government service.

     I have known Steve for over twenty years. When I first came to work as an attorney for the Department of the Interior in the 1980's, Steve was already the Assistant Secretary for Lands and Minerals. Although he was relatively young, he had already served several years in Virginia state government. He had helped reform the Office of Surface Mining from a dysfunctional agency to an effective regulator. He impressed me as someone who was hard working and knowledgeable, but who also went out of his way to make sure everyone felt like part of the team. He was not only well respected by his subordinates; he had a real following of loyal friends.

     When I was selected as Secretary of the Interior, Steve was an obvious choice for my Deputy Secretary. He had experience and a deep understanding of Interior issues, but he retained the idealism to believe that we could make a difference. He shared my view that finding ways to protect the environment while providing for the economic and recreational needs of Americans was an important undertaking.

     Steve made personal sacrifices to re-enter public service. He ended his lobbying partnership, knowing that not only would his government salary be far less than his private sector earnings potential, but also that government ethics rules would restrict his future ability to handle Interior issues. At the point in his career when he could have reaped his highest financial rewards, he opted to pursue the idealistic path.

     When the Senate confirmed him as Deputy Secretary, he launched into a schedule of long hours and hard work. He took on some of the toughest and least rewarding projects. In particular, we faced the daunting challenge of reforming over a century of

June 1, 2007
Page 2

bureaucratic management of lands and funds held in trust for tribes and individual Indians. He put together a diverse group of tribal leaders to explore and negotiate agency reorganizations and operational improvements. There is little way to really express the magnitude of the challenge. It included accounting complexities that would confound the most sophisticated banks, inconsistent practices used at scores of different locations, labored attempts to design and implement new computer systems, and a toxic litigation environment. Overlaying all of this difficulty was an emotional component: for American Indians, the government's management of trust assets tied back to long decades of suffering abuse and injustice.

Steve devoted his considerable problem-solving skills to this task. He recruited an outstanding and talented team. He bought pizzas and Chinese food for late night and weekend work sessions. He met with and talked with tribal leaders enough to develop an in-depth understanding of their concerns. He tried again and again as various proposals were considered, but ultimately blocked or rejected by one group or another. Throughout, he worked with employees to improve our management systems. There were no quick fixes that could magically heal old suspicions and scars, but Steve's dedication and leadership brought improvements far beyond anything ever achieved in recent decades.

This episode illustrates several things: Steve's willingness to listen to and work with people, his dedication to working hard on the most thankless tasks, his ability to lead and inspire a team to continue making progress despite difficulties. There was no personal benefit to Steve in taking on such an overwhelmingly difficult task; instead there was personal risk since everyone who "touched" Indian trust became embroiled in the litigation. He took on this task out of the same sense of duty and honor that brought him to public service in the first place.

The reality of Steve Griles is in many ways different from the public perception. His powerful size and bearing seem intimidating, but those who know him realize he is a compassionate and caring person. He helped co-workers who were struggling. He was encouraging and upbeat when people got discouraged. He was quick to praise people and applaud their accomplishments. We all knew he wouldn't be able to get through his good-bye speech at Interior without choking up.

Steve was truly enthusiastic about our efforts to improve national parks and encourage landowners to enhance wildlife habitat. He would often return from official trips with glowing reports of the great things Interior employees or local citizens were doing for the environment. Steve has a personal interest in history, so he became especially involved with Ford's Theatre and the Jamestown Quadricentennial.

Steve's experience in the private sector made him understand business perspectives, but it also made him an effective regulator. He understood and pushed for more stringent oversight in several situations that had not occurred to his less-experienced subordinates.

June 1, 2007
Page 3

From a personal standpoint, I was pleased by our ability to work well together. Many men would have difficulty working with a woman as a superior, especially a woman he had once outranked. Steve instead was supportive and encouraging. We had one of the best, if not the best, working relationships of any Secretary and Deputy Secretary in the Administration.

Steve has an extraordinary sense of duty – the same view of honor that motivates others to serve the public in the military. With these values at the core of his being, and the motivation for years of work and sacrifice, the current situation hurts him very deeply.

I recognize this is not the phase in these proceedings for re-examining the particular aspects of the case against Steve. But I can say, as someone who saw his work on a daily basis, that I continue to believe he served the Department and the nation well.

I sincerely hope the Court will take Steve's dedicated and distinguished career of public service into account in considering his case.

Sincerely,

Gale A. Norton
Former Secretary of the Interior

**FILED**

MAR 2 3 20⁣⁣⁣    **ORIGINAL**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT    07- 79 (ESH)

**ATTACHMENT A**

FACTUAL BASIS FOR THE PLEA
OF JAMES STEVEN GRILES

This statement is submitted to provide the Court with a factual basis for my plea of guilty

to the charge of Obstruction of Proceedings Before the United States Senate in violation of

Title 18, United States Code, Section 1505, filed against me in this matter.

1.      On March 8, 2001, the defendant, JAMES STEVEN GRILES, was nominated

to serve as the Deputy Secretary of the United States Department of the Interior ("DOI"), the

Federal agency responsible for, among other things, such Native American matters as tribal

recognition, gaming compacts and applications to place land into trust for gaming purposes,

and distributing Federal program funds. GRILES was confirmed by the United States Senate on

July 12, 2001, and upon being sworn in on July 17, 2001, served as the second-highest ranking

official within DOI until he resigned effective January 31, 2005.

2.      From January 2001, to March 2004, Jack A. Abramoff was a Washington, D.C.

lobbyist with a law and lobbying firm identified herein as "Firm A." Abramoff's client list

included Native American tribal governments operating, or interested in operating, gaming

operations on designated Federal land, and others seeking Federal recognition and program

funds. Abramoff also represented other entities subject to DOI oversight. Consequently,

Abramoff and his clients had a substantial and recurring interest in decisions made by DOI

and its officials.

3.      "Organization A," which purports to be a tax-exempt organization under Internal

Revenue Code Section 501(c)(4), was founded in 1997 and run by "Person A." Since its

inception, Organization A operated through contributions from donors. In or about June 1998,

Person A set up Organization A in Washington, D.C. Thereafter, GRILES took an active interest

in Organization A and began assisting Person A in raising funds to support Organization A until

GRILES was confirmed as DOI Deputy Secretary. From sometime in 1998, and continuing

through early or mid 2003, GRILES had a personal and, at times, romantic relationship with

Person A. GRILES and Person A remained close friends for some time after their romantic

relationship ended.

      4.     GRILES was introduced to Abramoff by Person A on or about March 1, 2001,

a week prior to GRILES' nomination to serve as DOI Deputy Secretary. During this meeting,

the three discussed GRILES' impending nomination, Abramoff's interests in DOI issues and

recommending colleagues for DOI positions, and Organization A. Thereafter, at some point

during his tenure as DOI Deputy Secretary, GRILES became aware of the fact that Abramoff was

a substantial contributor to Organization A. GRILES has since learned that between March 2001

and May 2003, Abramoff personally and through his clients donated a total of $500,000 to

Organization A.

      5.     As a result of GRILES' personal and romantic relationship with Person A,

Person A's introduction of Abramoff to GRILES gave Abramoff more credibility as a lobbyist

than Abramoff ordinarily would have had with GRILES and facilitated the building of a

professional relationship between Abramoff and GRILES that ordinarily would have taken years

to develop. Consequently, during GRILES' tenure as DOI Deputy Secretary, Abramoff had a

unique relationship with GRILES that distinguished him from other lobbyists and allowed him

access to GRILES directly and through Person A indirectly.

      6.     Both before GRILES' confirmation and during GRILES' tenure as DOI Deputy

Secretary, Abramoff occasionally sought and received – both directly and through Person A –

GRILES' advice and intervention on various matters within the jurisdiction of DOI that directly affected Abramoff and his clients.

7.      On October 20, 2005, GRILES submitted to a voluntary interview conducted by investigators for the United States Senate Committee on Indian Affairs ("Senate Committee"), which was investigating allegations of misconduct by Abramoff and others made by several Native American tribes. In the October 20, 2005 interview, the Senate investigators focused on, among other things: the level of access Abramoff had to certain officials within DOI, including Deputy Secretary GRILES; the nature and extent of GRILES' relationship and dealings with Abramoff and Person A while serving as DOI Deputy Secretary; whether GRILES, Abramoff, and Person A communicated about issues pending before DOI that directly affected Abramoff's clients; and whether GRILES, in fact, had advised Abramoff and intervened on issues pending before DOI that directly affected Abramoff's clients. GRILES was aware of the scope of the Senate Committee's inquiry prior to the commencement of his interview.

8.      During his October 20, 2005 Senate interview, in an effort to conceal the true nature of the circumstances under which he met Abramoff through Person A and how and why GRILES' relationship with Abramoff developed, GRILES did not testify fully and truthfully when questioned by Senate investigators about the true nature and extent of GRILES' relationship with Person A, the person who introduced Abramoff to GRILES; how and why GRILES' relationship with Abramoff thereafter developed; and the nature of Abramoff's access to GRILES. Instead, by way of example, when asked the following questions, GRILES gave the following answers, knowing the underscored declarations to be materially false statements about his relationship with Abramoff:

Q:    How would you describe your relationship [with] Mr. Abram[of]f over time?

A:    He was a lobbyist in town, who occasionally I would see or have a discussion with. As I did with numerous, numerous other lobbyists around town. No different than others.

Q:    Would you describe hi[m] as a friend?

A:    No. I was friendly toward him. But I – he was not a friend of mine.

Q:    If – and what you just described represents the extent of your relationship with Mr. Abramoff? It never exceeded that?

A:    No.

Q:    That's as good as it got? He was another lobbyist with whom I did business. Just as I did business with many others in town?

A:    That is my vision, and there was nothing unique about it. Then there are lots of those people in this town, who are lobbyists, who are very personal friends of mine, but he was not one.

                              ***

Q:    So, those communications [with Mr. Abramoff], as you s[aid] before would have been no more distinguishable from the many communications you had with the myriad of other lobbyists that come to you on a daily basis, about matters affecting their clients?

A:    Yeah.

Q:    Is that a fair statement?

A     That is a fair statement. That I didn't distinguish him from anybody else.

9.      On November 2, 2005, GRILES testified in public hearings held before the Senate

Committee in furtherance of the Senate Investigation. Senators John McCain (R.-AZ) and

Byron L. Dorgan (D.-ND), then-Chairman and Vice Chairman of the Committee, respectively,

presided. Among other things, the Senators questioned GRILES about the true nature of his

relationship and dealings with Abramoff and Person A while GRILES served as DOI Deputy Secretary.

10.    During his November 2, 2005 Senate testimony, in an effort to conceal the true nature of the circumstances under which he met Abramoff though Person A, and how and why GRILES' relationship with Abramoff developed, GRILES did not testify fully and truthfully when questioned by Senate investigators about the true nature and extent of GRILES' relationship with Person A, the person who introduced Abramoff to GRILES; how and why GRILES' relationship with Abramoff thereafter developed; and the nature of Abramoff's access to GRILES. Instead, by way of example, GRILES gave the following testimony, knowing the underscored declarations to be materially false statements about his relationship with Abramoff:

Griles:    . . . [Abramoff] also apparently has claimed to have special access to my office on behalf of his Indian gaming clients. That is outrageous, and it is not true.

***

Griles:    My relationship with Mr. Abramoff was, as with other lobbyists, nothing more, nothing less, just as it would be with Senators and other interest groups. I returned calls directly. If people called, I had those calls returned by others who had direct responsibilities.

***

Griles:    . . . As I said, my relationship with Mr. Abramoff is no different than any other lobbyist.

***

Griles:    . . . There was no special relationship for Mr. Abramoff in my office. It never did exist.

11.    The underscored declarations identified above in Paragraphs 8 and 10 were not true, as GRILES then and there well knew for the reasons stated in Paragraphs 5 and 6.

The underscored declarations were material to the October 20, 2005 Senate interview, the November 2, 2005 Senate Hearing, and the ongoing Senate Investigation into Abramoff and others in that it was material that the Senators and Senate investigators who questioned GRILES learned the truth about the nature of GRILES' relationship with Abramoff and Person A.

12.    GRILES admits that the materially false and misleading statements and testimony described herein may have or had the effect of, or were capable of, influencing the Senate Committee's assessment of GRILES' credibility overall and the following conclusions drawn by the Senate Committee in its September 5, 2006 Final Report:

> Based on the information in its possession, the Committee cannot definitively conclude what, if anything, Griles did to assist Abramoff's clients on matters then pending at Interior. In its totality, the information described above supports relatively modest propositions, namely, that Abramoff believed that he had influence over Griles, either directly or through [Person A]; that Abramoff told others that he had a robust relationship with Griles or had some influence over decision-making at Interior; and that it was likely on that basis that he may have directed his Tribal clients to "contribute" to [Organization A]. However, it must be carefully said that, without more evidence, it is plausible that, in fact relying on his relationship with [Person A], Abramoff may have simply exaggerated his access to Griles to his clients.
>
> In any event, given the paucity of evidence in the Committee's possession, the Committee is unable to arrive at any definitive conclusions as to the veracity of Griles' testimony on his relationship, and interaction, with Abramoff during all times relevant. And, without a good faith basis for concern that Griles may have been untruthful with the Committee, further exploration is beyond the scope of the investigation. . . .
>
> ***
>
> . . . Unfortunately, the extent to which [Person A] actually sought to influence Interior on pending matters affecting Abramoff's clients remains unclear. Also unclear is what, if anything, Griles (who Abramoff believed was [Person A]'s contact at Interior) might have done on behalf of Abramoff's clients at Interior and (if Griles did anything) what his motives for doing so might have been.

"Gimme Five" – Investigation of Tribal Lobbying Matters, S. Rep. No. 109-325, at 244-45 (2006) (Final Report before the United States Senate on Indian Affairs) (emphasis in original).

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge filed in the criminal Information against me. I am competent to make this statement and I do so knowingly and voluntarily and because I am in fact guilty of the crime charged. I have discussed this factual basis with my attorneys, and I understand that this statement is admissible as evidence against me if I fail to comply with the plea agreement.

DATE: March **20**, 2007

_____
JAMES STEVEN GRILES
Defendant

Counsel for James Steven Griles:

_____
BARRY M. HARTMAN, ESQ.
BRIAN W. STOLARZ, ESQ.
Kirkpatrick & Lockhart Preston
   Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006
T: 202-778-9000
F: 202-778-9100

_____
STANLEY M. BRAND, ESQ.
Brand Law Group, P.C.
923 Fifteenth Street, N.W.
Washington, DC 20005
T: 202-662-9700
F: 202-737-7565

Page 7 of 7

December 12, 2007

The Honorable Judge Ellen S. Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Huvelle:

On December 14, 2007, I will stand before the Court and await sentencing because of my
Congressional testimony and because I failed to pay income taxes between 2001 and
2003. I have no excuses for this conduct, and I am deeply sorry for it.

I should have realized the impropriety of Mr. Griles' relationship with Mr. Abramoff. I
should have realized the impropriety in their dealings with me. I should have more
honestly questioned their true motives. And I should have spoken out on my own
initiative and when called upon.

I blinded myself to the improprieties that surrounded me. But I did so for reasons that
require some explanation. I truly hope that the Court understands that this snapshot of
my professional life does not reflect who I am as a person, or the principles for which I
stand.

For the vast majority of my professional career, I have dedicated myself – professionally
and emotionally – to societal causes. I started CREA because I knew that there was no
better way to honor my mother's memory than to form an organization dedicated to
children (CREA's original focus) and the environment. In the years that ensued, CREA
was my life, and its success, especially in the early years of its existence before Mr.
Abramoff and I first met, remain among my proudest personal and professional
accomplishments.

Sadly, my idealism in advocating for environmental values led me to ignore the clear
warning signs that both Mr. Abramoff and Mr. Griles may have had ulterior motives
adverse to my own. For example, when I started CREA, I relied heavily on the advice of
others, such as Mr. Griles whom I trusted as a close friend, in large part because of his
exceptionally close relationship with my former boss and mentor, Gale Norton. Against
better judgment, I did not question the propriety of his advice. For those lapses in
judgment, I am wholly responsible.

I was drawn to Mr. Abramoff professionally because I understood him to have similar
values to my own – a love for politics and for a conservative environmental agenda. I did
not then realize that the Mr. Abramoff I knew, a lawyer at a prestigious law firm, was the
same man who continuously abused his relationships and the law, for his personal
aggrandizement. As I now fully appreciate, Mr. Abramoff's goals did not serve any

laudable purpose, and certainly did not mirror what I had hoped to accomplish professionally through CREA.

By 2005, when I testified before the Senate Committee on Indian Affairs, I feared that there was significantly more to my interactions with Mr. Abramoff and Mr. Griles and others at the Department of Interior than the mere business meetings and conversations I thought had taken place between us. The impact of these fears, which has since been proven a reality, culminated under the lights and pressure of questioning from members of the Senate Committee on Indian Affairs. There, under oath, I minimized and otherwise attempted to avoid answering questions about my various relationships, interactions, and recollections. I placed my loyalties with people I thought were my friends instead of realizing that I should not feel obligated to help those who broke the law and betrayed the public trust. I was wrong and I am truly sorry.

With respect to my taxes, I should have paid them. I understand how important it is for every individual to pay the taxes he or she owes to the Government and, through it, to the American people. This was an unacceptable transgression that will not happen again. I agree with the government's calculation of the money which I owe and am prepared to sign a consent order committing myself to its payment.

I have learned so much from this unfortunate situation. I have spent a significant amount of time these past months working closely with Government investigators, helping them with ongoing investigations. I have also had significant time to reflect on what I did and what I could have done differently. Simply put, this experience has been life altering for me.

As difficult as this experience has been, I have also have had one very positive revelation. I could not possibly be more thankful for the support of my friends, family, and colleagues. In a town that Harry Truman once mused was devoid of loyalty in the form of friendship, I have been amazed by the resiliency and loyalty of my friends over the course of the past three years. For that unconditional support and loyalty, I am truly humbled. I will be forever grateful.

I have the utmost respect for this Court, the Department of Justice, the Congress, and, ultimately the American people who are justly served by its government. Truly, I wish that I had conducted myself differently. I pledge to the Court, my family, my friends, and myself that I will forever heed the valuable lessons I have learned from my past mistakes.

Sincerely,

Italia Federici

October 16, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I am writing this letter to encourage you to grant Italia Federici probation on Nov. 16th. I have known Ms. Federici for just over a decade. I firmly believe she has integrity and attempts in both her professional and personal life to do the right thing. The young woman I know is passionate about the environment, passionate about politics, compassionate and cares about others – sometimes to the neglect of herself. Italia is not a criminal and is the type of person our justice system creates probation for – someone who takes the lessons of a mistake seriously and uses that knowledge to rebuild her life.

At 58 I am more a contemporary of Ms. Federici's mother, and although our relationship now is one of cross-generational friendship, we have been boss and employee and I have at times been a mentor to her. I am a small business owner, spent 20 years as a reporter, editor and newspaper owner, a decade as an elected state legislator and eight years as a state agency executive. I served as chairman of the Colorado House Judiciary Committee for six years and chaired the National Conference on State Legislatures Law and Justice Committee. I have the greatest respect for our courts and our justice system. In my political life, I managed four statewide election campaigns, including three campaigns for Gale Norton, former U.S. Interior Secretary and Colorado Attorney General. I was in the Colorado General Assembly when Ms. Norton announced her candidacy for U.S. Senate, serving on her steering committee. When the legislative session ended, I managed Ms. Norton's Senate campaign, having managed both her initial attorney general campaign and her subsequent re-election campaign.

I met Ms. Federici when she was hired by the Norton for Senate campaign in April 1995. Italia joined the campaign prior to my becoming campaign manager and was with the campaign throughout. Italia did not stick to a job description. In fact, she was indispensable in helping stage and organize fund-raising and campaign events, organizing and coordinating filming for advertising and developing lists of individuals for the candidate to contact personally for support and fund-raising. Italia almost single-handedly organized Gale's appearances at the many major county assemblies that are the foundation of Colorado's delegate selection process, making sure that the candidate was everywhere she needed to be on time and free of logistical worries.

She pitched in to help whenever she saw a need. If Gale needed a driver to get her from one event to another, Italia was ready to step in and do it. If phone calls needed to be made to uncommitted delegates, Italia was dialing the phone and pitching the candidate's qualifications. If funds needed to be raised, Italia would work with the fund-raising coordinator to set up phone calls and personal appointments for Gale. If signs needed to be delivered to volunteers, Italia would load them into a car and get them there. If brochures needed to be picked up from the printer or delivered to an event, we could count on Italia to do the job if a volunteer didn't show up or everyone was committed elsewhere. No one is indispensable, but Italia certainly lent her skills and expertise to the campaign in ways that many others could not and did not.

It was a particularly difficult time in Italia's personal life. She was a young woman, trying to find her own path in life while dealing with the imminent death of the person who meant most to her – her mother. Although I never met Italia's mother, I know from knowing Italia that she was a warm-hearted human being who was devoted to her daughters. She raised them to be strong, compassionate women who were involved in their world and the lives of others. The fact that Italia dealt with her mother's death in July 1996 and returned to work on the campaign during its final hectic days was a significant tribute to the mother she had just lost.

Italia helped clean out the campaign offices and then returned to Florida to deal with cleaning out and storing the things she and her sister wanted to keep from their life with their mother. She returned to Colorado with an idea – starting an environmental non-profit as a tribute to her mother that would focus on business-like solutions, pragmatic approaches and fiscally sound ways to deal with improving the environment.

Although a niche policy issue at the time that was gaining little traction among Republicans, it was becoming clear in 1996 that environmental concerns would be a factor in national elections in the future for years to come. That has certainly proved true.

Italia began by organizing a group of individuals with whom she had worked on the Norton campaign and other Republican officeholders she had met during the campaign and began talking about ways Republicans had already invested in resolving environmental issues and how we could do more. Her enthusiasm for the issues was infectious and from those meetings, she created the organization, using the money she inherited from her mother's estate as the seed money to pursue her dream.

Knowing that policy decisions on environmental issues were made in Washington, D.C. and that fund-raising opportunities for the organization would be better there, Italia reluctantly moved from Colorado to Washington, D.C. During the years she built the organization her enthusiasm for the environmental issues on which she soon developed significant expertise – unparalleled by most – never waned.

The organization had successful events and campaigns, and attained a small, but growing donor base of sustaining members. Italia's passion and unstinting efforts to keep contacting potential donors are the things that kept the organization alive during more than one lean year over the next decade. We talked several times about the timing for her to walk away from the organization and take her talent and expertise to a different level on another career path. Italia, however, was reluctant to walk away from the organization in which she had invested so much of her time and a huge emotional stake as its founder.

The non-work side of Italia is the warm, friendly and witty young woman with a great sense of humor who has joined in our family celebrations. She spent Thanksgiving at my sister's home in Virginia and everyone commented on her ability to fit in quickly and volunteer to cook a specialty dish for the family meal. She spent Christmas in Colorado with my family here and we truly enjoyed her company. She is generous in spirit and adores young children, who quickly recognize someone who is willing to read to them and just enjoy the fun of spending time with the very young.

She provided an opportunity to my niece, another passionate future policy advocate, to attend and work at the 2004 Republican National Convention in New York. My niece, Jennifer, was in high school at the time and had attended a political leadership program in Washington, D.C. that summer. She wanted the opportunity to observe the political convention process and be a part of it. Italia, who was involved as a sergeant-at-arms for the convention, found Jennifer a volunteer registration job that allowed her access to convention events and offered her the opportunity to help with events and a place to stay in New York during the convention. For a high school junior who loves politics and was getting ready to run for the national presidency of a youth organization, that opportunity was invaluable. The fact that Italia took the time to help Jennifer accomplish her goal demonstrates her generosity and willingness to mentor others.

My regret is that when Italia needed my counsel and advice on CREA management issues in 2004 and 2005 I was dealing with the debilitating effects of Grave's Disease and its treatment. Maintaining my own daily work schedule as the director of a 240-person state agency at the time, while managing the diagnostic tests, dealing with the worsening symptoms of the disease and later the radiation treatment left me with little ability to be available to her as a friend and mentor.

She has been welcome and will continue to be welcomed by me and my family for whatever time it takes for her to chart a path to rebuilding her life and using her knowledge and skills to accomplish that task and beyond. Events of the past few years have taken their toll on Italia's spirit. She was disheartened at being accused of laundering money and misusing the very organization she founded in honor of her mother and press coverage that deliberately misrepresented both her organization and its goals and her personally.

However, I believe her resilience and determination – evidenced in the way she has picked herself up and started again after several difficult life-changing events – will provide her a foundation to rebuild. She is one of the quickest learners I know and grasps intricate elements of public policy and subtle nuances that most of us miss. She cares deeply about this country and the political processes that make it work – in fact, the type of citizen who doesn't sit back and wait for someone else to do the job.

We need more citizens with Italia's passion for making things work in this country. Granting her probation would recognize that Italia, like most of us, makes mistakes in judgment. We learn from those mistakes and move on with our lives. I hope you will agree that Italia's mistakes have been costly to her and that probation would serve both society and Italia by allowing her to rejoin the work world, begin paying her restitution and rebuilding her life.

Sincerely,

Jeanne M. Adkins

*Vickie Agler*
*10289 W. Burgundy Ave.*
*Littleton, Colorado 80127*

October 19, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Huvelle,

I am writing today on behalf of Italia Federicci who will soon be appearing before you for sentencing.  I would appeal to you to consider any leniency that you can muster for this fine young lady.  Judges are given discretion in sentencing for exactly the type of circumstances that surround Italia's case.

I am a former State Representative in Colorado.  One of the duties I undertook in my tenure was to head up the intern program for the House of Representatives.  Over the years I met and interacted with hundreds of young, promising young people—truly some of the best and brightest in our state.  I found I had a real knack for sensing who was going to be able to excel in the stressful but exciting world of politics.  In all my years in working with energetic and intelligent young people, I have yet to meet anyone who surpassed Ms. Federici's potential.

I met Ms. Federici in 1995 when I became the Assistant Campaign Manager of the Gale Norton for Senate campaign.  My first impressions were genuine amazement that she could multi-task with such competence.  Her energy level was infectious to the entire campaign staff and volunteers.  Her intelligence and political savvy—particularly for her age and inexperience—soon became invaluable to all of us.  But perhaps, more than anything else she added to "the heart" of the campaign with her "can do" spirit and resilience.  There was simply no job too big or too small for her to tackle.  If she was assigned a task, you knew it would be done promptly, completely and with a flair that only Italia could bring to it.  My respect for this young lady grew by the day.

When she began to exert her expertise in the policy realm, it was clear that she would also excel in this arena.  Her passion for finding a way to "wake-up" the Republican side of the aisle as to the need to embrace business sensitive solutions to the evolving problems of our environment was contagious. She seemed to see the issues so clearly

compared to many harden "policy wonks" and refused to be swayed by the many that simply dismissed her ideas as naïve and "just not part of our agenda." Because she was so articulate and passionate, she was able to translate her ideas into working models that resonated with many leaders in Colorado. She then turned and looked beyond her achievements here and was able to envision her goals at the national level. I must admit, I stood on the sidelines and watched in amazement. Her commitment to invest her personal capital, financial and emotional, was exceptional and admirable.

We kept in touch over the years as she worked to advance her dream and nurture it into a valuable contribution to the political policy process. My admiration and respect for her continued grow. Even as she struggled to make her organization grow and develop, her energy level and commitment remained undaunted.

During the year that I worked closely with Italia, we developed a deep personal friendship. When you work in such a public arena, you make lots of acquaintances, but good friends are often hard to come by. Italia was so giving, affable, trustworthy and intelligent that becoming her friend remains a real treasure in my life. One of her most outstanding attributes is her integrity. My hope is that through the letters you have received that you can gain a glimpse of the Italia that I have come to know over the years.

I am not privy to the details of the case against Ms. Federici, but I do know that if she made mistakes in judgement and relationships, she still retains the unquestionable potential to get beyond these mistakes and learn from them and turn them into steps toward a remarkable future. I would ask that you help Ms. Federicci at this dramatic turn in her life by extending the mercy of the court to this wonderful young women. Thank you for your consideration.

Sincerely,

Vickie Agler
Former State Representative, HD 28

Gretchen Anderson
5200 Ayrshire Blvd.
Edina, MN 55436

October 23, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I would first like to introduce myself. I am a stay at home mother of two. I moved my family to Minnesota from Colorado three years ago.

I have been a close friend of Italia Federici's for over a decade. Italia is the type of person that is always willing to help and support her friends. After the births of each of my children she was the first to visit my home –she even went to the store to get supplies which meant so much, especially since I lived 45 minutes from the nearest town. When we both lived in Colorado we were able to see each other often; taking the children and our dogs out for hikes in the mountains and trails. She has always loved and cared for the outdoors, which I'm sure is why she decided to start her organization.

When Italia decided to move to D.C. it was with a heavy heart. She did not want to leave the mountains of Boulder, Colorado in exchange for the hustle and bustle of the city. And she did not want to leave her good friends. But she knew that if she was to ever get CREA off the ground she would have to take that leap. I know that she has worked very hard and has lived frugally to accomplish her goals. I also know that it has not been easy for her.

I have witnessed a definite change in Italia's spirit in the last few years. She has always been very passionate about the environment and dedicated to the issue of environmental clean-up, always finding joy in her work. But I noticed that something had broken her spirit and taken the wind from her sails. I thought she was working too hard and sacrificing her health in the process. Her diminished enthusiasm and zest for life has been of concern. After hearing what she is being accused of and the way the press has made her out to be a villain, I am certain that it is the reason for her depression.

I believe Italia to be honest, trustworthy, hard working, kind, compassionate and loyal.

I am blessed to have Italia as a friend.

Sincerely,

Gretchen Anderson

LAW OFFICES

# ROBERT W. ANNAND, P.C.

1200 G STREET, N.W.
SUITE 800
WASHINGTON, D.C. 20005
(202) 223-3670
FACSIMILE (202) 661-6107
rwannand@earthlink.net

ROBERT W. ANNAND
ADMITTED IN D.C. & PA

OF COUNSEL
RAPHAEL F. PERL
ADMITTED IN D.C. & MD

December 9, 2007

The Honorable Ellen Segal Huvelle
United States District Court
    For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:  Sentencing Hearing for Italia Federici

Dear Judge Huvelle:

    I have practiced law in the District of Columbia for approximately 30 years.  I have an undergraduate college degree in accounting and a graduate legal degree in taxation.

    During March 2005, I was contacted by Italia Federici to prepare the annual tax return for the tax exempt organization she was president of, the Council of Republicans for Environmental Advocacy (CREA).  At our first meeting, she introduced me to CREA's vice president, Jared Carpenter.  At that meeting, I was asked and agreed to prepare the previous year's annual return for CREA.  I was also asked and agreed to prepare individual income tax returns for Ms. Federici and Mr. Carpenter for 2004.  At that meeting, we discussed my preparing not only the personal tax returns for 2004, but also returns for earlier years.

    I understood that CREA had recently stopped using an accounting firm located in Alexandria, Virginia.  At probably that first meeting, I learned that CREA had been treating Ms. Federici and Mr. Carpenter as independent contractors and not as CREA employees.  As a result, no income tax or employment taxes had been withheld for the compensation.  I advised them both that as officers and directors of CREA, this tax treatment was improper.   I was told that the previous accounting firm had never advised them otherwise.  It was agreed that CREA would immediately begin treating them as employees, and I also assisted CREA to prepare and file employment tax returns beginning on March 31, 2005.

    It was clear from that meeting that Ms. Federici had only limited knowledge of the due dates and other tax filing requirements for both CREA and her personal returns. I understood that Mr. Carpenter maintained CREA's financial records and had worked with the previous accounting firm in the preparation of the prior years' returns.  From that point forward, I worked almost exclusively with Mr. Carpenter to obtain information to prepare both CREA's and Ms. Federici's tax returns.

The Honorable Ellen Segal Huvelle
December 9, 2007
Page 2

While preparing CREA's annual return and Ms. Federici's and Mr. Carpenter's individual returns, Mr. Carpenter gave me copies of Form 1099s for Ms. Federici and himself that I was told had been prepared by their previous accountant. Mr. Carpenter told me that these forms had been filed with the Internal Revenue Service. Later, I so advised representatives of the Internal Revenue Service and the Department of Justice during my interviews with the DOJ and IRS representatives. I have now learned from Mr. Carpenter's sentencing documents that the Form 1099s were never filed with the Internal Revenue Service. To the best of my knowledge, Italia Federici had no knowledge that these forms had not been filed with the Service.

Mr. Carpenter also never informed me that he had outstanding tax liabilities from prior years. In fact, on more than one occasion, I suggested to Mr. Carpenter that I found it unusual that the Internal Revenue Service had never sent notices to either Mr. Carpenter or Ms. Federici requesting that they file their prior year's personal income tax returns.

Shortly after I met with Ms. Federici and Mr. Carpenter, I provided to each a rough estimate of the total tax liability, including penalty and interest, that each would owe to the Internal Revenue Service from the compensation that they had received from CREA. Throughout the time period that I worked with CREA and Ms. Federici, she maintained the belief that she could reestablish CREA's financial viability or with some other project, she could produce sufficient income to pay all her tax liabilities to the Internal Revenue Service.

Prior to the time I provided these estimates, I do not believe Ms. Federici had any comprehension of the extent of her tax liabilities. In fact, she seemed shocked that she could owe so large an amount since she worked for a tax-exempt organization. She seemed to rely on Mr. Carpenter to maintain both the organization's financial records, and her personal financial records.

She can best repay the Service by beginning to move forward with her life, and I hope that she finds leniency in your court so she can rebuild her life and pay her obligations.

Very truly yours,

Robert W. Annand

December 10, 2007

The Honorable Ellen Segal Huvelle
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

     Re: Italia Federici

Dear Honorable Huvelle:

It is my understanding that Ms. Federici will be up for sentencing this week. This letter is to provide my perspective regarding Ms. Federici.

In terms of my background, I came to Washington in 1969 and served in the U.S. Department of Justice; served as Chief of Staff when U. S. EPA was created; served as Legislative Counsel for EPA; returned to the Justice Department as Associate Deputy Attorney General and have practiced law in the environmental field for over 30 years.

Approximately seven years ago, the Deputy Secretary of Agriculture suggested I meet Italia Federici, and he indicated she was working with an organization called Council of Republicans for Environmental Advocacy. The purpose of this organization was to raise awareness as to all the activities undertaken in the past by Republican leadership and to point out excellent environmental programs being implemented by various governors in the United States. I met Ms. Federici and was impressed with her program. From time to time she invited me to attend meetings to speak out on environmental and agriculture programs benefiting the environment. From time to time foreign governments would have high level environmental staff in town and I was invited to participate in these sessions through the leadership of Ms. Federici. She was and is highly regarded as a person who was trying to solve major environmental problems through education and data. I found her ideas and dedication to be outstanding.

She and her organization were highly regarded by many environmental leaders including myself. Her honorary board included me and many other well known environmental leaders. The fact that she had such individuals on her board was a testament to the outstanding work that she was performing on environmental issues in the United States.

                           Sincerely,

                           Gary H. Baise

CARL BIERSACK
8197 Cottage Rose Court, Fairfax Station, VA 22039

October 4, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Huvelle:

My name is Carl Biersack and for nearly two decades I have had the honor and good fortune to work at the intersection of public policy and politics – first, as a Senate staffer and later as a lobbyist and government relations professional.  I write on behalf of Ms. Italia E. Federici, who I recognize now has serious legal problems.  I do not know all the details, but I'm here to say that for over a decade I saw Italia as a consummate environmental advocate who shared her knowledge and passion of this policy issue with many in the public policy-making process.

I first met Ms. Federici around 1994 when the Council for Republican Environmental Advocacy (CREA) was being formed.  At CREA's launching, she provided a series of meetings on CREA's mission, scope and agenda.  Over the years I continued to have contact with Italia, and she remained an energetic, forthright and knowledgeable environmental policy/reform advocate who explained the politics of environmental law and its uneven implementing rules and impacts.  She often would decipher nuances of environmental legislative proposals advancing in Congress.  Through those discussions, I learned just how active she was in reaching out to many Members of Congress and their staffs in both chambers.  Candidly, the information she provided helped me be a more effective staffer.

When I moved downtown to work in a lobbying firm, I continued to hear from CREA and Italia.  She wanted to ensure my clients were aware of CREA's advocacy and its interest in environmental-related legislation.  I attended social events where CREA gathered people from the Administration, Congress and the corporate world to talk about the interaction of environmental laws and rules across different federal departments and market spaces.  These events were informative mini-think-tank level exchanges.

She knew CREA's small size limited her role, so she picked her media battles carefully.  I remember one year she issued a press release that accurately predicted a pronouncement from a large politically biased environmental organization and deflated its impact.  CREA, an association run on a shoestring, went toe-to-toe with a major national organization and prevailed.  I'm sure that success and others brought Italia job offers for a bigger environmental platform, but she persevered at CREA helping DC folks learn to talk about the environment with less fear and more authority.

Thank you for the opportunity to present a side of Ms. Italia Federici that perhaps one cannot glean from the trial record.  Across a decade I never saw Italia's enthusiasm and activism for environmental issues diminish.  Even when I met her in a social setting, she was still working on environmental matters.  She was totally dedicated to CREA's mission.  I hope it helps you as you consider your solemn decision on an appropriate sentence for Ms. Federici.

Sincerely,

CARL BIERSACK

### ADAM AUGUSTINE CARTER

ATTORNEY AT LAW
888 17TH STREET, NW
SUITE 900
WASHINGTON, DC 20006-3307

———————

ADMITTED IN DC, VA & MD

TELEPHONE: 202-261-2803
FACSIMILE: 202-261-2835

ACARTER@ACARTERLAW.COM
WWW.ACARTERLAW.COM

4 December 2007

The Honorable Ellen Segal Huvelle
United States District Court
    for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

          Re:     *__Italia Federici__*

Your Honor:

          I write to you in support of my former client and friend Italia Federici.

          From August 19, 2003 until the case settled in January of 2005, I was the attorney of record representing Ms. Federici in a case styled *Federici v. Morris*, Civil Action No. 02-CA-9824 ("Morris Case").  The Morris Case was prepared to be tried before The Honorable Michael Rankin in the Superior Court of the District of Columbia, and settled in Ms. Federici's favor in the weeks prior to trial.

          Throughout the Morris Case, which was a more difficult situation then a simple recitation of the facts might suggest, Ms. Federici conducted herself as a model citizen and an excellent client.  This time period was extremely difficult for Ms. Federici and she trusted me to help her navigate her way through some very trying circumstances.  In fact, Ms. Morris's actions against Ms. Federici were so egregious that these facts were brought to light in another suit against Ms. Morris (in Florida) and as a result of her combined infractions in various states and jurisdictions, Ms. Morris is now a fugitive -- on the run since 2004.  The first person to stand up to Ms. Morris, no matter how unpleasant the task, was Ms. Federici.  She and I discussed on any number of occasions that doing the right thing can be unpopular and trying.  However, Ms. Federici did just that.

          Despite the obvious pain that she was feeling that finally forced her to take action, a decision I know that she did not arrive at lightly, Ms. Federici was attentive to her case, she was extremely helpful to her lawyer, she complied with every request, and she provided candid and truthful testimony that shed light on some very important facts.  She was respectful of the judicial system and its process even when there were developments that were not positive.  The criminal justice system cannot protect every citizen from every wrong and the civil system can sometimes be an option when that is the case.  Whether it is a criminal or a civil case, being a

The Hon. Ellen Segal Huvelle
4 December 2007
Page 2 of 2

victim and a witness is hard. The fact that Ms. Federici not only came forward as a witness and talked about her victimization, but also took on the financial burden of carrying the case forward is a testament to her nature and her belief that the judicial system would work.

I believe the Morris Case was Ms. Federici's top priority during the time period given above. I was speaking with Ms. Federici on an almost daily basis while the Morris Case was in its active stages and at least weekly throughout that litigation. I also had an opportunity to review the file of Ms. Federici's prior counsel on the Morris Case and I have determined from the correspondence and the file that Ms. Federici was also actively engaged with her former counsel in the prosecution of the Morris Case in the time period November 2002 to March 2003. Without in any way detracting from the seriousness of the current matter, I do know that Ms. Federici was very distracted by and upset by the facts and circumstances that resulted in the Morris Case and then the ensuing litigation which wreaked havoc on her life for about 3 years. I would say this time frame is from about March of 2002 through January of 2005. I believe that Ms. Federici was just trying her best to manage each day during this challenging time.

Had not Ms. Federici been such a good, credible and attentive witness and client, I doubt we would have succeeded in winning the very difficult case that we won. Nor indeed would Ms. Federici have been of value to the other plaintiff against Ms. Morris in another state. Ms. Federici's assistance in that case was given by her willingly, at her own expense and without seeking any kind of benefit.

One example of Ms. Federici's respect for the law was evidenced by something that happened during the Morris Case. I advised Ms. Federici to delay carrying out CREA's document retention program in 2003 by delaying the destruction of office hard drives because the discovery period had not yet closed in the Morris Case, and even though it was a personal matter. Certainly, Ms. Federici could have ignored my advice – which was to prevent spoliation – and there would have been no way to challenge her decision. However, Ms. Federici scrupulously followed my advice, and adopted the most cautious stance. By the time the discovery period closed in the Morris Case, news accounts had surfaced of Mr. Abramoff and the investigations into his dealings. Even though Ms. Federici and CREA were still about a year from receiving a subpoena, it is my understanding that Ms. Federici again acted out of an abundance of caution and again, preserved the CREA hard drives. As a result of my advice and Ms. Federici's conservative approach, those hard drives were preserved and made available to the Government for inspection in their ongoing investigation of activities surrounding Mr. Abramoff.

I respectfully ask that Ms. Federici might be granted leniency in the matter before you so that she can begin to repay her debt. With many thanks for your kind consideration, I am

Yours very truly,

Adam Augustine Carter

*Mackie Christenson*
*(Mrs. Ronald L Christenson)*
*133 Martin Lane*
*Alexandria, Virginia 22304*

October 22, 2007

The Honorable Ellen Segal Huvell
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC   20001

Dear Judge Huvelle:

I am writing to you regarding Italia Federici who I have known for approximately ten years.  While I was Finance Director at GOPAC, Italia was busily organizing CREA and so our paths crossed at many political functions and meetings over the next few years.  From that time until as recently as this summer, whenever I have needed assistance or advice or another person on the ground for any event, Italia has been there with no thought of personal gain, volunteering her creative ideas, her personal time and "can-do" attitude.

I grew to admire her tireless efforts on behalf of CREA; her poise, maturity and professionalism; and her knowledge on the subject of the environment.  She is a person of action, who lives and breathes her work.

Also, Italia and I share our Roman Catholic faith.  Over cups of coffee, we have discussed her spiritual life.  Losing both parents at such a young age has not made her bitter but has deepened her faith.

Italia Federici is a good person and a good citizen, interested in public service who has become entangled in a political snare.  Regarding this Abramoff matter, I imagine there are many in this town thinking, "There but for the grace of God, go I."   Politics can be a treacherous walk on a career path.

Italia is young, very intelligent and has much, yet, left to contribute to society.  There is nothing to be gained by this talented woman going to prison, but much could be lost.

Please feel free to telephone me with any additional information or assistance, if needed in this matter before you.  Cell: 703-350-0184 or Office: 703-302-1012 X 227

Sincerely,

Mackie Christenson

S. Scot Christenson
133 Martin Lane
Alexandria, VA 22304

October 22, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

It is my pleasure to write this character reference for my friend and colleague Italia
Federici. I have known and worked with Italia for almost eight years and can state
without reservation that she is one of the most admirable people I have had the privilege
of encountering in my professional and personal life.

I first met Italia soon after I arrived in Washington, D.C. in 2000 to work at a major
public relations firm. We bonded quickly because we shared much in common such as
our background in journalism and interest in environmental issues. I was immediately
struck by her quick wit, determination and passion for her projects. I was even more
impressed when I learned of all that she had accomplished at a young age without the
benefit of having the support of a family. I quickly realized that Italia was an incredibly
gifted person with whom I was fortunate to become acquainted.

From the moment I met her, Italia has never hesitated to offer assistance or advice in all
aspects of my life. Italia has never had to be asked for help, she has just done it out of
pure consideration for my best interest. Whether it was making sure I was invited to an
important event or lending a hand to complete a trying task, she always took the initiative
to reach out to me. Italia's generosity and thoughtfulness are qualities that have been
enjoyed by not only me, but many others as well.

Italia has also proven to be an infinitely valuable resource because of her extensive
knowledge of environmental policy. As the editor of a public policy magazine, I once had
Italia write an article concerning the state of environmentalism. The piece that she wrote
was so insightful and provocative that it was made the cover story. Of all the magazines I
published, the issue featuring her piece generated the greatest response from both readers
and policy analysts. Over the years, Italia has continued to be a reliable source for
information and astute commentary on green issues. The organization she founded, the
Council for Republican Environmental Advocacy, provided a significant and unique
service by presenting environmental concerns that were often overlooked or
misunderstood by the populace. Italia was absolutely dedicated to growing CREA and I
remain in awe at what she built.

As for the recent circumstances that bring Italia before you, I do not know very much. To be honest, the little that I do know, I do not really understand. However, I have witnessed how this ordeal has put a tremendous strain on her. The entire affair has been incredibly costly in financial, professional and especially emotional terms. This is tragic because Italia is truly a well-intentioned person who may have simply made a mistake while navigating the often murky waters of DC politics. I sincerely believe that Italia's motivation has always been driven by her loyalty to her friends and to the mission of CREA without any emphasis on personal gain. I now ask that you consider her abundance of positive qualities while taking into account the extent to which the past few years have been a draining experience. Italia may have lost a lot over the past few years, but she will never lose my respect.

Sincerely,

S. Scot Christenson



CHARTWELL EDUCATION
GROUP

October 29, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle,

For over twelve years, it has been my privilege to have Italia Federici as a respected friend. I know her well and very much want the opportunity to convey my perspective on her quality and character as a human being as you deliberate on the matter before you.

By way of brief introduction, I have worked in government, politics and business for the past 25 years. I served two United States Secretaries of Education Lamar Alexander and Rod Paige. My recent service was as the Chief of Staff of the United States Department of Education from 2001-2003. Currently, I am the co-founder along with Secretary Paige of the Chartwell Education Group. As the President and CEO of Chartwell, I have assembled a team of our country's top experts in education from early childhood through post-secondary education. Among our esteemed colleagues is Dr. Laura D. Tyson, the former Dean of the London Business School and chief economic advisor to President Clinton. Chartwell works on projects in the United States and throughout the world -- Ukraine, Georgian Republic, Brazil, Qatar, and the UAE – in order to make a difference in the lives of the world's children. I have been married for ten years and have three fantastic children ages 7, 5 and 3. My office is in New York and we reside in Darien, Connecticut. I am a member of the Union League Club of New York and serve on the for-profit boards of SchoolNet and BrightStar as well as the non-profit boards of the Center for Education Reform and StandardsWork. Finally, I serve as the Vice President of the Duke of Edinburgh International Awards – Young American's Challenge at the invitation of HRH The Earl of Wessex.

Italia and I first met over Labor Day weekend in 1995 at the initial gathering of what became known as Frontier Weekend -- a group of enthusiastic and perhaps idealistic young leaders from around the country. That time in our lives proved to be pivotal for Italia and me because we both announced at this meeting our intention to found two entities which would be very important in our lives. Mine was the founding of an education company to address the needs of at-risk middle and high school students and Italia's was to found a non-profit with her mentor Gail Norton to provide conservative ideas to environmental reform. Italia's entity became CREA and it was based on her passionate desire to improve the environment in positive ways by applying a new set of principles that had been ignored up to that point.

I was immediately impressed by Italia that weekend as a young woman with character, vision and passion as well as a considerable amount of intellect. It was clear to me that had she chosen to start a company, rather than a non-profit, where I might have the chance to invest – I would gladly have put my money behind her! However, Italia is simply not "wired" that way. She impressed me then and has continued to do so over the past twelve years as a person not driven by money but rather as a person driven by ideas and the common good. In all the years I have known Italia, she has lived modestly, has invested everything she had personally to invest in order to support her commitment to the environment.

I have attended numerous CREA events over the years as I have attended thousands of other similar affairs in Washington and around the country. As a matter of quality, CREA's events were always first rate, substantial and attended by a wide-range of talented individuals. What Italia was able to build through CREA was worthwhile and an authentic contribution.

Italia is human and not perfect – just like the rest of us. But I can say based on my years of knowing her as a friend, observing how she took an idea in 1995 and developed a meaningful entity to do good things over an extended period in many ways ahead of her time, and sharing a number of mutual friends, Italia is a good person and a quality citizen. Washington can be an unforgiving city in many respects and I have certainly observed more than a few who have not upheld the public trust as they had promised. I have also seen truly excellent people make innocent mistakes that turned into real trouble not because of their malevolence but because of their naiveté. I would put this circumstance that Italia is confronting in that latter category without hesitation. Therefore, I am respectfully requesting that you apply the greatest degree of leniency provided to you in deciding this matter for Italia Federici, in whom I am now particularly proud to call friend.

Sincerely,

John M. Danielson

**JOHN DENDAHL**
6439 EAGLE FEATHER TRAIL
LITTLETON, COLORADO 80125-8310

VOICE/FAX (720) 981-0466
j3dendahl@swcp.com

October 9, 2007


The Honorable Ellen Segal Huvelle
Judge of the United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

<u>Re: Italia Federici</u>

It is my hope that this letter will be helpful to you in the important sentencing matter before you.

I am a retired business executive who held CEO positions in banking and high technology.  For more than eight years following retirement, I was chairman of the Republican Party of New Mexico.  That made me ex officio a member of the Republican National Committee, where Ms. Federici and I became acquainted on account of her complementary work with the Council of Republicans for Environmental Advocacy ("CREA").  I believe this introduction was in 1997.

Earlier I had done work similar to hers, helping found and lead New Mexicans for Jobs and Energy.  That group's purpose was to support and communicate our belief that, in contributing vitally to employment and tax base, the state's extractive industries (mining and oil and gas production) were operating within practices that assured protection of air, land and water.

Sometime after our 1997 introduction, I agreed to Ms. Federici's invitation to serve on an informal CREA advisory board, a group of individuals on whom she could rely from time to time for advice or assistance.  Our periodic contacts from then until I ceased chairing the NM state Republican party in May 2003 indicated Ms. Federici's thorough devotion to CREA's important work.

<u>My most recent work with CREA and Ms. Federici:</u>  In August 2004, organized environmentalists staged a "hearing" in Albuquerque on U.S. National Parks matters.  Pre-event publicity as to sponsorship and scheduled speakers raised serious doubt as to impartiality and balance.  As we expected, in the event these speakers shared the theme that the National Parks had deteriorated on account of deficient funding during President Bush's first term, along with more general condemnation of Bush administration commitment to

The Honorable Ellen Segal Huvelle
October 9, 2007
Page 2

matters important to environmentalists.  We believed that, to the contrary, Bush had promised
and delivered increased funding for important Parks maintenance work.

Ms. Federici called me a few days before the "hearing" to see what I knew of it and
whether I could identify one or more National Park Service employees or retirees willing to
provide a fair accounting of progress in Parks maintenance, etc. during the then-recent past.  I
did, she and a CREA staffer joined us at my Santa Fe residence on the day of the "hearing,"
we traveled to Albuquerque where my NPS retiree friend was able to speak, I had several
press interviews, and we were able to go a long way toward balancing the message coming out
of the "hearing."

In all my dealings with Ms. Federici, I found her entirely committed to the purposes for
which I understood CREA had been organized: advocacy of protecting air, land and water
while conveying the message that environmental protection is an important, bipartisan value.
Had she been so inclined, she had numerous opportunities to suggest to me — a sympathetic
like-thinker, political party leader and fund-raiser — any number of ways that money could be
made available for her use; no such suggestion was ever forthcoming.

My wife and I deeply regret whatever circumstances have brought Ms. Federici before
you.  We hope you find that our experiences as told here reflect favorably on her.

Very truly yours,

John H Dendahl

John Dendahl

The Honorable Ellen Segal Huvelle
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

November 25, 2007

Dear Judge Huvelle,

I am Italia Federici's younger sister, Helene, and I want to take this opportunity to share some details about my sister. I love my sister very much and very surprised that she has found herself in any trouble. It is not at all like her to be involved in something like this and we are all very upset for her.

Italia and I grew up together in Florida. We lived on a small island in the Gulf of Mexico where we spent every day on the beach, and then later we moved to another small beach community on the East Coast of Florida. Growing up in this environment and spending summers in New England with our aunt and uncle, both Italia and I spent a great deal of time in the outdoors and learned from early ages to appreciate nature and wildlife.

When I was in middle school, Italia volunteered to help chaperone my Brownie troop's field trips. All of my friends always loved having my sister join our activities. We all looked up to her. She was creative and would elevate our creative projects and just make everything more fun. If you know my sister at all you know how silly she can be.

I think Italia's naivety is one of her most endearing qualities. Our mother would often say that she thought Italia may have come from a different planet. That was our mother's way of highlighting my sister's unique and 'out of the box' frame of mind. It is this uniqueness that has guided her through life and her successes. You really have to know her to understand this juxtaposition of intelligence and naivety.

My sister played classical guitar for our church's choir I think from the time we moved to Delray Beach up until she left for college. I remember after dinner on Wednesdays she would leave for rehearsals and on Sunday's, she would be there front and center with guitar in hand. It was because of her commitment to her school and church that she earned a reputation among the parents of her peers for being responsible. When activities would come up, parents would ask, 'Is Italia going to be there?'

Guitar was not my sister's only creative outlet. At some point she started bringing artwork home from school. I was always blown away by how creative and talented she was. Many of the art assignments were to practice a technique but she made each piece beautiful. I was inspired. She later went on to win awards and art scholarships. She created a larger than life size statue that created quite the buzz in our little beach community. It was photographed in the paper and inspired a naming competition in the Palm Beach Post.

My sister was very smart and very social and when she graduated from high school it did not surprise our family that Italia was named Miss Congeniality and she also was awarded a Social Consciousness Award for Commitment to Her Fellow Human Beings, as well as being granted early admissions to college in a challenging engineering program. My sister was the first person to win the humanitarian award – her high school created it for her because of something she did her senior year involving a fellow student who was having a hard time. It just never occurred to my sister that she shouldn't try to help.

My sister and I loved our mom and we were devastated when she was diagnosed with breast cancer. Our mom and our family friends did not pressure me or Italia or our friends to use money as a gauge of value or to prioritize money over more important things like intellectual pursuits and creative outlets. When our mom passed away, my sister wanted to do something that she had talked about with our mom and she founded CREA and RPA.

I know my sister turned down very high paying opportunities in Washington, D.C. as well as prestige jobs in political offices in order to continue her commitment to the non-profit she loved. She did not move to Washington, D.C. to be closer to power and money. She was recruited to move there by people in Washington who felt that she could make a big difference and CREA was very successful because of her dedication. Because largely of the values instilled in her by our mom, she was not lured off the non-profit path by the many temptations around her.

I hope my sister can have another chance to keep doing the work she loves. Thank you for your consideration.

Sincerely,

Helene Federici

Raymond Gifford
2975 Howell Road
Golden, Colorado 80401
(720) 855-0603

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
c/o Mr. Jonathan N. Rosen
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo
701 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C.  20004

Re: Italia Federici

Your Honor:

I write in support of Italia Federici and to give the court a sense of the person I have known for 12 years. I have no knowledge of the particulars of her plea agreement or the alleged facts that got her in this predicament. Nonetheless, my wife and I have known Italia for some time now, and will certainly vouch for her idealism, sense of purpose and dedication to the causes for which she worked. She obviously has made and is admitting to some serious mistakes. Nonetheless, I do not believe that her errors were made with evil or corrupt intent.

I first met Italia in 1995 where we worked together on a political campaign in Colorado. I was the campaign treasurer; Italia was the jack-of-all-trades advance person, volunteer organizer and campaign aide. Her dedication to the job was remarkable, taking up seven days a week and all hours of the day. What was more remarkable is that she did it for free. The campaign had very little money. Despite that, Italia dedicated herself to the cause and worked without being paid. Even when she was finally paid, she only asked for salary going forward, and not for the months of gratis volunteer work. She is someone who believed in, and dedicated herself to, political causes.

While in Colorado, after the failed campaign, Italia continued her path of political activism. She had a political-entrepreneurial streak, when she decided to start up two groups: Council of Republican Environmental Activists and Republican Patrons for the Arts. She thought up and organized these groups on her own, with the single goal being to rehabilitate and overcome the image of Republicans as anti-environment, and Philistines to boot. To start these groups, Italia enlisted many of her friends from Colorado politics. She did all of this on a shoestring, and received help from many friends who admired her moxie and energy.

In all my dealings with Italia in Colorado, she approached her job with dedication and vigor. I never saw any venal motives to her political entrepreneurship, only a desire to help the political causes she believed in. She was young, bright, energetic and truly believed she was doing good. If anything, she was too naïve and too energetic for her own good. She would trust people who offered to help, and take peoples' representations at face value. Though not quite a political naïf, Italia did not have a trace of cynicism or world-weariness about politics and its ways.

When Italia moved to Washington in the 2000 time-frame, we lost touch somewhat, though she would stop by to see me, my wife and kids when she happened to be in Denver. Her excitement over a re-invented DC-version of CREA was palpable, and she seemed totally dedicated to the cause of burnishing Republicans' conservationist credentials. She was in it, from my vantage, for the 'cause' and the excitement of the Washington political scene. Again, I never detected a venal motive in anything she was doing with CREA.

I do hope that this letter helps portray to the court the Italia Federici that I know. She has obviously made some mistakes, but her purposes and motivations, from what I know, were for a broader cause, and not for her own enrichment and aggrandizement.

Sincerely,

Raymond Gifford

# PATTON BOGGS LLP
## ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

December 4, 2007

Benjamin L. Ginsberg
202-457-6405
bginsberg@pattonboggs.com

The Honorable Ellen Segal Huvelle
United States District Court
        For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: <u>United States v. Italia Federici</u>, Case No. 07-CR-79 (ESH)

Dear Judge Huvelle,

From 1998 to 2007, the Council of Republicans for Environmental Advocacy ("CREA") sought my legal advice on certain matters germane to the lawful operations of CREA. My work was primarily with Italia Federici and reflected her desire, within the ambit of my subject-matter expertise as an election law counsel, that CREA act consistent with federal law.

For approximately eight years, Ms. Federici actively solicited my advice to discern the lawful extent of CREA's issue advocacy activities with respect to, among other things: (1) issue advocacy advertisements; (2) handouts distributed by CREA; (3) polling issues, including the presentation and substance of polling and focus testing presentations; (4) internet and other ad scripts; (5) compliance with fundraising rules, regulations and guidelines; and (6) grassroots issue advocacy materials.

Ms. Federici was not CREA's financial officer. However, she did have an area of oversight and she did seek advice so that CREA's publications and public advocacy statements complied with the law. As a result, CREA has never been accused of violating election law or of non-compliance in their grassroots advocacy activities. My interaction with her indicates Ms. Federici's intent that hers and CREA's public advocacy comply with the law.

In addition, my contact with Ms. Federici reflects her intent to incorporate CREA properly. In 1999, after Ms. Federici discovered a need for CREA to reincorporate itself, Ms. Federici retained my firm's services. In August, 2000, we counseled Ms. Federici on the lawful creation of the 501(c)(4) and oversaw the preparation of documents and filings to create that entity. Ms. Federici also consulted with us concerning the process for CREA to become an officially recognized Non Governmental Organization with the United Nations, an effort that we were informed resulted in CREA's successful acceptance and admission.



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Ellen Segal Huvelle
December 4, 2007
Page 2

To the limited extent I conferred with Ms. Federici concerning her contacts with Jack Abramoff, I observed an intent to comply with the law. On one occasion, in 2004, Ms. Federici approached me to discuss the disposition of CREA hard drives in accordance with CREA's document retention policy. At the time, media reports about Mr. Abramoff had surfaced. While Ms. Federici said that CREA was not in a possession of any subpoena, her description made it seem that there was a high likelihood CREA would receive one about the Jack Abramoff matter and I told Ms. Federici so. I told her that despite the fact CREA may not at that time have possessed a subpoena, CREA might yet possess information helpful to law enforcement. I counseled Ms. Federici to keep any information related to matters involving Mr. Abramoff before engaging in her regular document destruction policy. I believed that Ms. Federici was concerned about following the law because she preserved all the materials.

In addition, a colleague at my firm worked with Ms. Federici to identify and correct certain tax paperwork irregularities which had been discovered during CREA's compliance with the government's subpoena. I am told that these irregularities were determined to be fairly routine in a small organization such as CREA and that the IRS took no action.

I hope these examples may demonstrate to Your Honor that Ms. Federici knew to ask about the law and attempted to comply with it.

Thank you for your time and attention in considering this letter.

Sincerely,

Benjamin L. Ginsberg

4925014

2115 Lakeshore Dr
Old Hickory
Tn. 37138
9/20/07

To The Honorable Ellen Segal Huvelle:

I have know Italia Federici for about thirty years. I knew her to be a caring child who grew into a concerned, compassionate young woman, especially about children and the environment.

I have been a childrens nurse for forty-five years and it was in that capacity I first got to know Italia.

Yours Sincerly,

Dorothy Godfrey R.N.

8601 Emerald Hill Drive
Austin, Texas 78759
(512) 372-9585

September 19, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

       Re:  Letter of Support for Italia Federici

Dear Judge Huvelle:

I have known and worked with Italia Federici for nearly a decade.

We first met when I worked for then-Texas Governor Bush on environmental policy and she was helping launch CREA.  We spoke about Governor Bush's and other Republican policymakers' environmental philosophies, programs, best practices, and successes, as well as how we could best share those with other policymakers and the public.

Over the ensuing years, including during my time in Washington working for President Bush, we met and brainstormed about how to improve environmental policy and the public discourse about that policy.  We have stayed in touch, and most recently (now that I am in private practice back in Texas, with Vinson & Elkins) I have enjoyed working with her on the EcoVision summit and green building initiatives.

I was quite surprised to read in the papers about the charges brought against Italia.  I have always appreciated her for being hard-working and dedicated to helping advance improved environmental policies.  She was proud of her work and conscientious about doing it well.  I am pleased to have had the opportunity to work with her over the years, and I look forward to continuing to do so.

I hope you will consider these positive factors as you make your decision.

Sincerely,

John L. Howard, Jr.

Andrew M. Langer
112 Banbridge Ave.
Centreville, MD 21617

October 24, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I am writing to offer you my thoughts on my friend, Italia Federici, who is due for
sentencing very soon by your court. My name is Andrew Langer, and I currently serve
as an advocate for small businesses with an organization called the National Federation
of Independent Businesses. I work to make sure that government policies work to assist
small businesses, and that at the very least they don't harm or destroy them. I do this
both on the general principles of fighting for the rights of small business owners to do
their business, and also work to assist my individual small business members with
problems they might be having with federal agencies.

For pretty much my entire adult life, I've been in the business of advocating for the
protection of individual rights, and it was in this capacity that I first got to know Italia. I
have known her for nearly a decade now, and she has become a good friend to me. I
wanted to put a more personal face on who she is as a person.

I first got to know Italia on a professional basis, when CREA was just starting out. It
was, and remains, an essential idea: the thought that Republicans ought not to turn their
backs on environmental issues, and embrace those issues within the context of
Republican beliefs and values. The mission of CREA was to show that the two were not
incompatible.

There were other organizations that had worked on various aspects—generally from a
non-partisan, more philosophical viewpoint. But CREA took the approach from that
partisan basis, seeing an essential need as the 90s were coming to a close, and the 21st
century was approaching. And Italia was the right person to take on that mantle.

Italia's talent lies in connecting dots that other people haven't connected, approaching
issues with an "outside the box" perspective. Perhaps it's because she spent so much
time "outside the beltway," but for whatever reason, her unique approach set her, and the
organization, apart from others within DC.

For example, Italia had an uncanny ability for recognizing disparate groups whose goals
were similar, and bringing those groups together. In DC, all too frequently, the adage of
politics making strange bedfellows simply doesn't exist, especially in the context of

partisan debate.  People just don't want to approach groups that they have fought with in the past.

But Italia could be an honest broker.  The reason for this is simple:  she's such an earnest and optimistic person.  In the arena of policy, idealists are willing to reach out to all sorts of people in an effort to bring them together, find common ground, and seek solutions to problems on that common ground.  On environmental issues, the issue is frequently jobs versus the environment, and during debates Italia would frequently bring together both people from the labor community and people from the natural resources community to find that common ground, and then work together to find common solutions.

I admired that earnestness.  I admired her ability to bring disparate groups together.  It's something that I learned from various people and institutions growing up.  And invariably as we became better friends that skill of connecting dots was something that I would call upon from time to time.  I spend a lot of time helping people "noodle" through public policy problems—and sometimes I'd call her to pick her brain about some issue or another.  It is a skill that is in high-demand in Washington, and Italia could have gotten a well-paying jobs somewhere connecting those dots on a for-profit basis.

But her earnest optimism and idealism made it clear that staying in the non-profit sector would be a better fit for her.

On a personal level, outside of our professional interactions, when I need clear advice from someone who can think through problems in a somewhat unconventional manner, Italia Federici is someone I can turn to.  She is someone who can give me an honest assessment, understanding the problem itself and, more importantly, understanding me, and then render some good advice.

She is also someone I know I can count on to be my friend through thick and thin.  In a city like DC, that's an even-more-rare commodity.

I remember one particular instance, in which I had learned some terrible information regarding two friends.  One friend was being incredibly deceptive to the other, and it was ultimately making their friendship a complete farce.  I could not detach myself from the situation—I agonized over whether or not to tell.

So I put the question to Italia, and Italia's answer was unhesitating:  I had a moral obligation to let disclose what I had discovered.  She understood my reluctance, but made it very clear that regardless of the short term pains that it might cause, it was imperative that my friend find out sooner rather than later.

She was, of course, completely correct.  This rose above the level of simply repeating scandalous gossip, into fundamental decisions about the future of friends.  This matter illustrates only one of many instances in which I have relied on Italia's good judgment.

So I ask that when you are deciding on a sentence for her, please consider that Italia is a thoughtful, idealistic person and a good friend to people. She has been a very good friend to me. She knows that what she did was wrong, and in addition to whatever sentence the court decides, she has been punishing herself as well.

That you for your consideration of this letter.


Sincerely,

Andrew Langer
Centreville, MD

THE

## WASHINGTON COMPANY

2924 M STREET, NW, 2ND FLOOR • WASHINGTON, D.C. 20007

20 November 2007

**VIA FIRST CLASS MAIL**

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

### Re: Italia Federici Reference Letter

Dear Judge Huvelle,

I hope this letter finds you well.   I have had the pleasure of knowing Italia Federici for nearly a decade in Washington, DC, primarily in a social capacity.

I have always known Italia to be a very generous and giving soul who has dedicated her recent life to causes that she has felt passionately about, to such an extent that she has foregone what some might consider of the normal enjoyments of life, and certainly has sacrificed what one might consider the regular indulgences of a customary young professional social life in Washington, DC.

Despite her immersion in her work, which was her driving purpose, she never hesitated to assist those around her, whether it was to organize and cook a holiday dinner for several of us 'orphans' who were unable to leave Washington at Christmas one year, or if it was simply to send a kind note of support to a friend who she sensed might have needed encouragement, she never hesitated to do so.

Regarding her commitment to her work and to the environment, I have known Italia to be a heartfelt advocate both of what she felt was right for the environment and what she felt was best for the community overall. She was equally passionate about discussing how she might assist developing countries in obtaining better environmental data as she was in protecting an area of pristine wilderness from what she felt was an unhealthy bid for development from a large mining company. She saw the environment as a shared resource for all of humanity, and her strong sentiments compelled her to champion its cause.

This past year, I had the good fortune to work with Italia on a non-partisan environmental symposium that she, I, and her dear friend Margaret Alexander felt could help increase the awareness in Washington of environmental best practices. The aim of the conference was to improve information sharing between the public and private sectors in order to foster better decision making by both. After the initial conference plans had been laid, Margaret was diagnosed with a recurrence of potentially terminal cancer. Italia spent most of her waking hours assisting Margaret Alexander and her family with their ordeal, and yet also wore two hats in our partnership to help advance the project, pending Margaret's return to daily work. Sadly and tragically, Margaret Alexander passed away as the project came into full swing, and I personally was uncertain as to whether we should even attempt to continue with it. Italia's resolve and determination to see Margaret Alexander's and our initial vision through to fruition is testament both to her commitment to honor the memory of Margaret, and to her general desire to see the best of things prevail around her.

I know that Italia will continue on this mission in the future, and I look forward to working with her and to supporting her efforts in doing so in the months and years ahead.

Sincerely,

G. Christom Larsin

November 13, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I am writing to you regarding my friend Italia Federici. I realize that in the coming days you will have an important decision regarding her future. As her friend I wanted to take a moment of your time to share with you the person I knew when she lived in Colorado.

Italia and I met in 1995 through the Republican Leadership Program. From 1995 until 1998, before Italia left for Washington DC, we developed a close friendship.

I know when Italia started her environmental group that it was visionary; she believed that the American public was in need of a dialogue on issues related to the environment. Almost a decade later we stand at a point where the seemingly most important issue in the world is the environment. Italia's vision, passion and concern for the environment placed her in middle of a political cause that allowed her to do more with her commitment than most people who are ever involved in public policy. I have the utmost respect for her vision and for being a leader in the debate about one of the critical issues of our day.

In addition to her vision for the world, she was also a caring friend. During those years while she was in Colorado I had a young family; we lived an hour north from all of our friends we had grown up with. Whenever we would have a barbeque or party for the kids, Italia was one of the few friends who would consistently make the drive to be with us. She understood the importance of having supportive friends.

Knowing your time is valuable I just wanted to take a moment to give you a glimpse of the friend I knew. A person that I could trust, turn to in times of need and a visionary person of action – Italia Federici.

Respectfully yours,

Tom Lucero

tom@tomlucero.com

970 978-1142

The Honorable Ellen Segal Huvelle
U.S. District Court, District of Colombia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Huvelle,

I am writing on behalf of my niece, Italia Federici, and respectfully ask for your kind consideration in reviewing all the details of her case. My husband, David, and I are both devastated that something that began as a wonderful opportunity for Italia, has instead resulted in such a difficult situation.

Italia is my sister's daughter and I have spent a great deal of time with her throughout her life. My sister was diagnosed with lupus when Italia was about 2 years old. Lupus is a very debilitating illness. Italia would spend time with me when she was very young and I lived in Washington DC, and spent summers with me and my husband in Connecticut. My husband and I wanted to expose her to some of the things that her mother was too ill to do with her, while also giving her mother a break.

At a time when most young people are off to college and are able to think of their own needs, Italia was not so fortunate. When Italia was 19, her mother was diagnosed with terminal breast cancer. The medications that my sister took for almost two decades caused serious complications and the cancer grew very aggressively. It was at this time that Italia's mother expressed her desire that in the event of her death, Italia become the guardian for her 13 year old sister. This was a very stressful time in her life. She attended Penn State and the University of Miami but the burdens of her mother's illness made prioritizing school difficult. Despite all this, though, Italia showed her fortitude by taking interesting jobs with a strong public policy dimension, including an internship as a reporter for an NBC affiliate. She studied journalism at the University of Connecticut and political science at the University of Miami.

Taking extraordinary lengths to extend her life, Italia's mother took a position as the children's librarian for the children of military families working at the NATO installation in Keflavik and moved to Iceland in order to expand her cancer treatment options. Italia's younger sister went with her mother. Italia was left in the United States. At that point, we were her closest family in the US. So, Italia came to live with me and my husband for two years. But these were wonderful opportunities for us to see what a strong and resilient person she was becoming. Rather than dwell on her problems she began doing what she had to do, to move on with her life.

In addition, we had Italia get cancer support/grief counseling and recommended that she might enjoy working for one of our US Senators. I worked in the US Senate in the 1970s and thought Italia would enjoy the political experiences that I found so rewarding. She took this advice and volunteered on the Lieberman for US Senate race. Soon thereafter, after befriending Jared Carpenter, who was also working on a political campaign, Italia

went to Florida and another statewide political race before she eventually moved to Colorado.

We were very pleased and proud of her when she landed her position on the Colorado U.S. Senate campaign that eventually led her to Washington. It was a tremendous accomplishment.

During Italia's time in Colorado while working on the Norton for United States Senate campaign, her mother lost her 6 year battle with breast cancer. Her death was devastating for Italia and her sister. About two weeks after she died, the Senate race ended and Italia had some choices to make.

My sister left the girls with some financial resources. Rather than think of her own needs, though, Italia thought she could use her funds to make a difference for something that she cared about. Italia trusted and had a great deal of respect for her employers and colleagues in public service and she thought that she too, could make a difference. Having discussed her love of the environment with her mother before her death, Italia wanted to honor her mother's memory by doing something that would benefit public policy.

So she has spent the last 12 years or so giving a great deal of her personal time and her personal funds for CREA in order to raise public awareness of environmental issues. She could have spent her money on cars, or used her time to pursue a high paying job like so many of the "Me Generation," but she felt the work she was doing was important and that it mattered. So her funds went to stuff envelopes or print press releases, or for many other CREA issues rather than for her own personal use or well being.

She has been able to succeed due to her very high intelligence which does not make it apparent that in many ways, she is very gullible and naïve. Italia has tried, despite numerous obstacles, to make a difference and to focus on the important things in life. She has demonstrated a great deal of strength when others may have given in or sold out for an easier existence.

My husband and I hope that you will consider these issues, and give her a chance to once again make the kind of difference to society that she feels is important. She has never had anything handed to her and yet she has been able to put things in the past and move on to do good works. We hope that you will give her the opportunity to continue to do so.

Sincerely,

Mrs. David Matesky
6 Bear Lane
Jackson, NH 03846

**The Honorable Dorothy Miller**
**2440 Virginia Avenue, NW**
**Washington DC, 20037**


October 15, 2007


The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle,

My name is Dorothy Miller and I am a recently retired Commissioner from the Foggy
Bottom Advisory Neighborhood Commission (ANC-2A) in Washington DC. I served in
the Marine Corps during World War II and was active in the Federation of Citizens
Associations of the District of Columbia before being elected to the ANC-2A in 1995
where I served for 12 years as one of six Commissioners. The ANCs are the body of DC
government with the closest ties to the people in the community. I strongly believe in the
importance of citizen involvement in community affairs and have long worked to
improve the surroundings and conditions of the communities in which I have lived.

I do not know the circumstances that have resulted in her appearance before you today,
but Ms. Italia Federici was one my constituents and I am writing to share with you some
of the community involvement in which Ms. Federici participated during the years she
resided in Foggy Bottom.

One of the main roles of ANC Commissioners is to present testimony to various
Washington DC agencies about policing issues, city planning, alcohol licenses and
related matters, public health and safety, sanitation and the like. In order for us to do our
jobs well, we must hear from, and interact with, the residents in the communities we
represent. That requires not only a time commitment from us, the governing body, but
also from them, the citizenry.

From 2003 onward, my fellow Commissioners and I were deeply involved in a matter
involving serious public health and safety concerns arising from a new establishment in
the neighborhood.

This establishment began to act as a nightclub in violation of the operating classification
and licensing it requested, and received: that of a restaurant. Foggy Bottom is actually a
quite neighborhood community with a high ratio of single family homes, residential

The Honorable Ellen Segal Huvelle
October 15, 2007
Page 2

apartment, and cooperative residences. There is a reason for the zoning and licensing process and the improper circumvention of that process by a commercial enterprise caused a great disturbance in our community.

There was a sharp rise not only in complaints about noise and disturbance of the peace, but also a steep rise in reports and allegations of vandalism, serious assaults, sanitation violations, health code violations, over-serving of alcohol, serving of alcohol to minors, and the attendant traffic issues including drunken driving.

As I am sure Your Honor can attest, it is easier to create a problem then it is to clean one up. At the monthly ANC meetings we sought input from concerned citizens and police liaisons. The next step was to attend Alcohol Beverage Commissions hearings as part of the process for protesting a status quo continuation of the violations in question. The various neighborhood governing bodies actively reached out to the community and requested citizen feedback and assistance.

Ms. Federici participated at each level of this process. She attended ANC meetings, learned the procedure for registering her apartment building as an official protestant before the ABC - and took the lead in her building by drafting and circulating the necessary petition for the input and signatures of her neighbors, attended the ABC hearings, and then attended each of the binding mediation sessions. This is a rather involved and time consuming, but critically important process.

Some of the meetings required foregoing more enjoyable after work activities in exchange for sitting in on local government meetings and negotiations at law firms. Others, like the ABC hearing, are unfortunately inconveniently scheduled during blocks of weekday work hours, making involvement by community participants scarce.

I am very familiar with this Ward, and the entirety of the neighborhood I represented for more than a decade. While the building in which Ms. Federici resided was exclusively rental and its occupants quite transient as a result, the build directly across the street from her residence was exclusively owner occupied by predominantly elderly occupants, a number of whom who had lived in that building for decades.

I understand that many of the tenants of Ms. Federici's building, who had no binding real estate ties and therefore complete mobility, opted to sue and/or move as a result of the circumstance created by this problem. However, Ms. Federici did not opt out, maintained her residence, and worked very closely with one of my colleagues on the Commission and with her elderly neighbors across the street, in order to effect positive and lasting community change.

The result of the entire community's joint efforts is that the establishment agreed to significant operational changes including closing earlier and eliminating activities that would encourage outcomes detrimental to the peace, quite and safety of the community.

The Honorable Ellen Segal Huvelle
October 15, 2007
Page 3


I thank you for you consideration of this information in your evaluation of Ms. Federici
and her value in the community.

Sincerely,

*Dorothy Miller*

Dorothy Miller

*William O'Keefe*
*5450 Brickshire Drive*
*Providence Forge Va. 23140*

*The Honorable Ellen Segal Huvelle*          *October 11, 2007*
*United States District Court for the District*
*Of Columbia*
*333 Constitution Ave.*
*Washington DC 20001*

*Dear Judge Huvelle:*

*I am writing on behalf of Ms. Italia Frederici, whom I have known for 10 years. I first met Ms. Frederici when I was the Executive Vice President of the American Petroleum Institute (API). As I recall, API was one of the early funders of her organization, CREA. Since taking early retirement at the end of 1999, I have had my own consulting practice but have maintained contact with Ms. Frederici and followed her work in the public policy arena.*

*I have spent most of my working career in the public policy field in Washington DC. Over a period of 33 years, I have dealt with a wide variety of people and organizations and have been involved in the hiring of many as well. It is from this back ground and perspective that I offer my assessment of Ms. Frederici.*

*During the time that I have known Ms. Frederici, I attended a number of CREA functions and was contacted by her from time to time to provide counsel and advice on CREA's program and fund raising initiatives. I know that she worked tirelessly to promote CREA's program. The effectiveness of her work was demonstrated by the attendance at CREA functions, at least the one that I attended or had knowledge of.*

*I have always been impressed with Ms. Frederici's dedication, work ethic, and her commitment to promote sound environmental policy. This may best be evidenced by her initiative in forming a labor and environment coalition with the Teamsters union. This was a creative approach to addressing environmental issues and demonstrated to me that sound approaches to policy could unite groups that did not appear to have much in common.*

*In all my dealings with Ms. Frederici, I have found her to be trust worthy and honest. She is an honorable woman who has committed her career to public policy and to promoting environmental improvement without regard for partisan politics or self enrichment. My impression of her from professional*

*and social contacts is that she is a warm, kind, and decent human being.   If she is guilty of anything, it is perhaps being too trusting of the intentions of others.*

*While I am not intimately familiar with the charges that have led to her being before you for sentencing, I am familiar enough with her character to believe that she would not knowingly violate laws and regulations governing her organization or her obligations in testifying before Congress.  I, therefore, ask that you administer justice with mercy and take into account her entire career, character, and basic decency.*

*Sincerely,*

*William F. O'Keefe*

October 19, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC  20001

Honorable Judge Huvelle:

I am writing this letter on behalf of Italia Federici. Italia lived in our building at 2401 Pennsylvania Avenue where we were neighbors, and over several years we came to know her.  Through my interaction with Italia I felt that she was committed to her environmental issues, neighborhood concerns and friends.

During the period that our family lived in Washington, I was struck by her enthusiasm for the issues she believed and cared about. While I was working full time, I had an opportunity to see her for walks and family events. She shared an interest in our two boys and her actions and manner were authentic and genuine. The boys always enjoyed her company and the time she gave to them over the years.

I cannot help but be saddened by the events which have dominated the last two years of her life.  I am not an expert in the business of the Federal Government but if Italia has violated a law, I hope that the Court will show her consideration. Many young people set out to achieve idealistic goals and get tangled in the process.

Our prayers for Italia are that she be allowed to rebuild her life, to pay any debts she owes and to keep her interest in our system of government and this great country which I know she truly cares for.

Thank you for your consideration,

Charlyn Page

# ANTHONY W. PARKER

The Honorable Ellen Segal Huvelle
United States District Court
      for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Re:    Italia Federici

Dear Judge Huvelle:

I am writing to tell you a little bit about the Italia Frederici that I know. My wife (who passed away in November of last year) introduced me to Italia about 4 years ago. I was running in a city-wide election to serve as the National Committeeman for the District of Columbia in early 2004 and she volunteered to help me get signatures for my candidacy. She then went on and hosted my victory party after I won the election.

Later in 2004, my wife became ill with leukemia. Her course of treatment required her to spend most of an eight month period in the hospital. While a lot of it was in Houston, Texas, Margaret was in the hospital for a cumulative amount of at least two months here in DC in 2004. Italia was one of the most regular visitors to see her. She was always thoughtful about bringing things that she knew Margaret might need and she was always available to cheer Margaret up.

In August 2006, my wife had a recurrence of her leukemia. We went to MD Anderson in Houston, Texas, in mid August, intending to stay for 5 days. We finally came home for the first time in the last week of October. Italia basically lived at our house during those two months, taking care of our dog and handling the day to day issues like managing the mail and making sure the house was in decent shape. She was thoughtful, caring, and loving. We could not have done it without her help.

After Margaret died, she stayed in touch. She has become a very good friend to me as well. She is thoughtful and caring. If anything, she thinks about others too much. There is nothing she wouldn't do for a friend.

I consider it an honor to be counted as one of her friends.

Sincerely,

Tony

Tony

# Constantin Querard
# 6909 W St Charles Ave
# Laveen, AZ  85339

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

October 5, 2007

Dear Judge Huvelle:

I am writing you today on behalf of Italia Federici, who will soon appear before you for sentencing.  I was hoping to give you a sense of the person that will be appearing before you.

I have known Italia since 1996 when we were in Colorado.  We were both working on campaigns for the U.S. Senate and were actually working on competing campaigns at the time.  It is due to her personality and professionalism that we became friends instead of "bitter rivals" as is far more common in that kind of situation.  While our candidates would be on stage debating each other, we would be in the back of the room sharing a sack lunch and giving each other a friendly hard time when our candidate would score a point.

Ultimately both of our candidates lost to a third candidate.  Still, Italia and I stayed friends even after the campaign ended.  As I recall it was during this already busy time when her father passed away and, if I recall correctly, her mother passed away shortly after him as well.  We do not often use the term "orphan" for someone in their twenties, yet that was the position that Italia suddenly found herself in.  As difficult as it was, she handled it with grace and few people knew of the tragedy that was in her life.  I have always respected her for the way she dealt with her loss.

Professionally and personally, I have never seen Italia handle herself with anything but the utmost integrity and decency.  Whether we were allies or competitors, she dealt with me in exactly the same way.  She has an enormous heart and, whenever I talk with her, she is usually involved in trying to help someone with something.  If I were to guess, that is probably how she ended up getting caught up in this whole sordid mess.

One prominent example of how she treated me was several years ago when I was in New York City, waiting to close on a loan that would allow my family to rebuild a hotel property we were involved in down in the Caribbean.  Sadly for us, the local government decided to block our efforts by announcing that they intended to nationalize our property. In this moment of crisis, I took the train to Washington, D.C. and asked Italia if she could be of any help while I visited with various Congressional offices seeking support as we

fought the seizure of our property. Italia dropped everything she was working on and spent the next several days helping me. And the attention we were able to generate played a major role in getting the island's government to drop their efforts for a time. She never asked for anything in return and even agreed to help us in our search for refinancing. It was in the context of this search that I first heard the name of Jack Abramoff. He was a gentleman that Italia had been led to who was tied to leisure interests that might be interested in assisting our refinancing. Although we never obtained the financing, Italia kept in touch over the next several years just to see how we were doing.

Another example of her selfless way is that during the previous story, she met my grandmother, who lives in New York City. And as Italia passed through New York City over the next few years, she would routinely offer to check in on grandmother for us. A small thing I suppose, but a very considerate thing that most people would not even think to do.

I do not know the details of what kind of trouble Italia faces, other than what I read in the newspapers. My conversations with Italia are less frequent due to the physical distance between us and my own growing family, which has reduced the frequency of my conversations with all of my friends. But I understand that you will be deciding her fate and I urge you to be as gentle with this good lady as she has always been with her friends and rivals. In your line of work you probably see a steady flow of bad people who have done bad things. Italia Federici is not one of them. She is a good person who, from what I can gather, has made a bad mistake. She is worthy of compassion and I hope and pray that she finds it in your courtroom.

If I can be of any further service, please do not hesitate to contact me at (480) 703-8145.

In gratitude,

Constantin Querard

Ernie Rosenberg
6304 Kellogg Drive ✳ McLean, VA 22101
Home: (703) 448-1940 ✳ Office: (202) 662-2505
Email: soapmanusa@yahoo.com ✳ Cell: (703) 403-4063

October 29, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

RE:  Italia Federici

Dear Judge Huvelle:

It is my pleasure to write this letter on behalf of Italia Federici.

I am the President and CEO of the Soap and Detergent Association, an association of companies producing cleaning products and their ingredients for the U.S. market.  I have been an environmental professional for over thirty years and have known Ms. Federici for at least 10 of those years.

Of course, I am writing this in my personal capacity and not on behalf of SDA.

I met Italia in the course of working on environmental issues.  From the outset, I thought she had creative ideas for addressing environmental protection from the perspective of trying to get something done instead of scoring political points.  She was full of energy, smart and had good political perspective on the issues.  She did not just want to advance Republican environmental policy, but to develop and promote policies that actually would advance environmental protection in an economically and scientifically sound way.  I also was impressed by her ability to reach out to non-Republicans and forge alliances that transcended partisan politics, which made progress possible.

Through her and the organization she developed, CREA, which was then known as the Council for Republican Environmental Policy, she introduced me to many other like-minded and dedicated people who had made their careers in the environmental field, as well as politicians who wanted to develop a genuinely progressive free market approach to environmental improvement.

Italia has been tireless in her efforts to improve environmental policy.  She has largely sacrificed her personal life in her dedication to CREA and related efforts.  She spoke of little else.  I am not even sure she slept; she seemed to always be on top of what was happening and getting a tremendous amount of work done.

I honestly do not think she ever made a distinction in her own mind between her work and her life.  Her work and CREA were her life to a substantial degree.

The Honorable Ellen Segal Huvelle
October 29, 2007
Page 2

In the last year, she has gotten friendlier with my wife and me on a personal level. She is a pleasure to be with, with an infectious sense of humor, friendliness and enthusiasm. Both my wife and I would love to see her spend time and energy on her personal life. She speaks almost exclusively about policy. We are policy junkies ourselves, so we did not mind.

I am, of course, aware of the issues facing her, though I was stunned to hear about them. I truly believe she was naïve and focused on her work and never thought for a moment that what she was doing might be illegal.

With her intelligence, insight, personality and drive, Italia could have been successful and gotten wealthy in Washington. Many have done so in law, consulting, politics and lobbying with far less to offer. She chose a path that she was committed to and enjoyed, but that was not a typical story of Washington ambition.

Italia is a good person who never indicated any motivation but wanting to do good. I hope she gets the opportunity to keep working for good policy. The country needs people like her who put good policy and the country's interests before personal ambition.

Whatever happens, my wife and I will be her friends. We have too few people of her quality in our lives.

Yours truly,

Ernie Rosenberg

To:The Honorable Ellen Huvelle,
United States District Court for the District of Colombia, 333 Constitution, Ave, N.W. Washington DC 20001

This letter is to provide information as to my dear friend Italia Federici.
Italia was always a great mentor and provided much needed guidance and lessons as a young girl. Italia was an amazing baby sitter to both my sister and I. She would make sure to take walks on the beach and talk about the positive effects of being a responsible adult. I remember several times Italia would assemble beach clean ups with us as well as build the best sand castles she made an impact on us to not be litter bugs and help out any way we could because that's what "good people do". She also taught me some of my first guitar lessons and was a wonderful and patient teacher to others as well. She was apart of her church choir and played classical guitar in her church.  My sister and I attending Sunday school with her and her sister Helene Federici, and she was a key factor in us attending in this study of the bible. As we got older and she became a very smart minded business woman my father took her on as an assistant to help with management and entertainment promotions. And she helped in many ways with my organization. '
 Italia in no way was or had bad or evil intent to any persons or organization. In my opinion she is a very honest and forth right individual, whom had dedicated her time to many great causes and activities that where beneficial to this planet & country. I can say I would trust her with anything of importance in my life. I hope this letter demonstrates some of the good character of this truly good person Italia Federici.

Sincerely,


Jeordie Schekeryk
11/1/07

X: Jeordie M. Sche[y]
11/1/07

*Melanie Safka Schekeryk*
125 Irwin Street
Safety Harbor, FL 34695

September 10, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
c/o Jonathan N. Rosen
 Mintz, Levin, Cohn, Ferris, Glovsky, Popeo
701 Pennsylvania Avenue NW
Suite 900
Washington D.C, 20004

The Honorable Ellen Segal Huvelle:
        I am writing this letter on behalf of Italia Federici. Talia  Federici is a
person that I have known since she was a child.  We lived across the street from
her on Fort Meyers Beach.  She has worked for me part time over the years.  We
were always pleased with her as she grew to be an honest and responsible
friend and employee.  We also knew her to be dedicated to causes of the
environment, even as she was growing up on the beach. I have always found her
to be a caring and concerned individual.  Please consider this an earnest
affirmation on Talia's character and integrity.
        My name is Melanie Safka Schekeryk.  I have been a writer/performer
going by the name of Melanie since the '60s.    I was the spokesperson for
UNICEF in the '70s and continue to sing and write and lend my services to
worthwhile causes.
        Thank you for your consideration in this matter.

Sincerely,

Melanie Safka Schek

Melanie Safka Schekeryk

**C. Michael Simpson, President**
**CMSCO International, Inc.**
**2100 M Street, N.W.**
**Washington, D.C. 20037-1233**

December 11, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

Dear Judge Huvelle,

Since first meeting Ms. Italia Federici over six years ago, I have had the opportunity to observe her both in her professional capacity as President of CREA and socially in her dealings with friends and associates. I have always been impressed by her enthusiasm for work on behalf of environmental causes and the enormous energy and unselfish efforts she always displays in trying to be helpful to others.

Having been in Washington for almost thirty seven years of my career, I have seen hundreds of excited and driven young politically motivated individuals, like Ms. Federici, attracted here to advance their causes and participate in the political process. Likewise, I have also seen how the process envelopes and uses many of these fine young people - some to their detriment. I truly think that to be the case in this instance with Ms. Federici. I had the opportunity to watch and participate in several events arranged or sponsored by Ms. Federici and her organization and I was always impressed by her unique ability to draw highly placed opposing political people, both elected and non elected individuals, to these events in order to establish a positive dialogue for controversial environmental issues. On each of these occasions I witnessed the admiration and appreciation these people expressed for Ms. Federici and her efforts. Her deep desire to do good things always came first.

The present situation Ms. Federici faces reminds me of an admonition expressed by my former law school dean when asked how to define "good judgment," exactly what does that entail? As the dean so wisely said, "Good judgment comes from experience, which usually is the result of bad judgment." We all have encountered this issue somewhere in our lifetimes. Likewise, I am certain Ms. Federici has gained a world of experience from some of her judgments of late, especially her encounters with some particularly nefarious individuals. However, knowing the character and many gifted talents she has exhibited to her many friends, including me, I am certain she will make many wonderful contributions as she moves forward with her life.

I would deeply appreciate your consideration of Ms. Federici's many contributions in your consideration of her sentencing.

Sincerely,

C. Michael Simpson



**BLANK** ■ **ROME** LLP
COUNSELORS AT LAW

Phone:     202-772-5956
Fax:        202-572-8388
Email:     Smith-d@blankrome.com

November 1, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

                Re:     Ms. Italia Federici

Dear Judge Huvelle,

    I am writing to provide a character reference for Italia Federici. My background is that I am an attorney practicing in the District of Columbia and have been in private practice as a lawyer and government relations specialist for nearly the last 18 years. Prior to that I spent 15 years in as an attorney public service with the United States Coast Guard, the Department of the Treasury, and most recently as a committee counsel in the House of Representatives. In addition, I retired from the U.S. Coast Guard Reserve last year after 36 years of service and attained the grade of rear admiral.

    As you may surmise, most of my legal and public career has dealt with policy and administrative law issues dealing with maritime and environmental matters. It was because of this common interest that I came to know Italia Federici. Specifically, my acquaintance with Ms. Federici was due to her leadership and direction of the Council for Republican Environmental Advocacy. Many of the policy issues that CREA brought to the forefront of public debate affected issues relevant to my practice. Her work afforded many of us in Washington, DC, the benefit of research and open debate on key issues such as opening the Alaska National Wildlife Refuge to drilling for oil and gas resources. These were tough, challenging issues, but Italia had the background and ability to bring together the key individuals in this debate. These included such interests as organized labor not just the typical oil industry advocates. Thus she was able to provide a balanced and thoughtful approach to these issues while firmly advocating a conservative viewpoint.

    Through these interactions, I was able to see a highly knowledgeable individual bring to bear substance as well as superb advocacy and organizational skills in carrying out her duties as



**BLANK ROME** LLP
COUNSELORS AT LAW

November 1, 2007
Page 2

the head of this non-profit advocacy group. In doing so, she adhered to the highest standards, not just a minimalist approach to compliance. Many points of view found there way into public debates on key environmental issues because of her commitment to seek out a broad spectrum of views and ability to bring those divergent viewpoints together in a civil and professional forum. She also served as a reliable and ready source of information on these key issues. In doing this she made key contributions to the formation and understanding of public policy issues regarding the environment.

As you may suspect, in Washington professional contacts turn into personal friendships. This is the case with Italia and a number of people, and certainly in my case. Italia and I ironically share August 12 as a common birthday. There is hardly an August that has gone by in the last several years, that many of us Leos are not gathered together by Italia for a delightful celebration of yet another year's passing. As you can see, in addition to being a trusted colleague in professional environmental matters, I consider Italia a loyal friend. She also has participated in many social functions sponsored by or hosted by my firm. Many of my partners know and welcome her as a sophisticated and engaging guest for our social events. Outside of these more public events, she herself has thoughtfully hosted or organized many a holiday gathering for many of us who end up stranded in DC for the holidays.

I would be happy to provide whatever further information you need in Ms. Federici's case. Please do not hesitate to call upon me to do so.

Sincerely,

Duncan C. Smith III
Partner

November 7, 2007

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I have known Italia Federici for the past four years. I am currently a junior at Virginia Tech, receiving a dual degree in Marketing and Human Resource Management. Over the years, Ms. Federici has continued to serve as an inspiration to me. She has facilitated both opportunities and experiences for me that would not have been possible otherwise. I can testify to both her sincere heart and compassionate spirit.

During my high school years I took a keen interest in the world of politics and policy. After starting a nationwide letter-writing campaign in my sophomore year of high school to urge Congress to retain Perkins funding, Italia took notice of my efforts and interests. That same summer, I had expressed an interest in attending a summer program in Washington, D.C., and while attending that program I talked about the upcoming Republican National Convention.

Upon hearing about my interest in attending the convention in New York City, Italia worked diligently to make my dream become a reality. Within weeks she had landed me a spot as a volunteer with media check-in and credential relations. As a result of her efforts, I had the opportunity to interact with many members of the media and political figures. The experience was invaluable and one that I will never forget. How many 16-year-olds get to live out their "dream job" in the New York City? Ms. Federici truly took me under her wing and allowed me to assist her with several events throughout the week. Even at a young age, she thought it was vital to introduce me to every influential person that walked through the door, including Gale Norton, former Secretary of Interior. After finding out that I could not afford a hotel room by myself in New York City, Ms. Federici allowed me to stay with her for the entire week.

Italia offered me support and guidance on occasion on choosing the right college and campaign insight on achieving my dream of running as the international president of a student organization. When I achieved that goal, she was pleased with my success and offered support.

Italia Federici is a giving and compassionate mentor and friend. She has inspired me to remain persistent towards my goals, no matter how unattainable they may seem. Attending the Republican National Convention was an unthinkable dream for me – one Italia made possible.

Sincerely,

Jennifer Waziralli

Mr. Jon Wadsworth
1242 E Street, NE
Washington, DC 20002

The Honorable Ellen Segal Huvelle
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

November 27, 2007

Dear Judge Huvelle,

My name is Jon Wadsworth.  I am a media relations professional, and have worked in both the political and private sector for then last 11 years.  I was introduced to Italia Federici in the spring of 2006 by a mutual acquaintance.  Our shared experiences of family working on Capitol Hill and interest in politics led to us becoming fast friends.  I am writing this letter to you because I believe that she is a good and caring person with a deep seated sense of idealism.

I say this from my own personal experience with Italia.  Last year, I lost my stepfather, Bill Warner, after a long and painful fight with lung cancer.  He had been an immeasurable part of my life since boyhood, and it was a devastating period.  Although I had only been introduced to Italia a few months earlier, she was one of the first people to offer comfort.  Having lost her own mother, she was an invaluable source of comfort and counsel, providing me with the proverbial "shoulder to cry on".  Her kindness and friendship during this awful time were a source of great comfort, and I am deeply indebted to her.

Italia is an enthusiastic and caring person who establishes friendships with persons across the social, economic, and political spectrum.  In a city that often times can become wrapped up in picking sides, it is refreshing to know someone who appreciates diversity in opinion and action.  It is this part of her that has guided her in her mission to form CREA, and not self-interest.   These are the same traits that led her to place her trust in others unwisely.

I believe her actions in the matter before you stem not from any form of malice, but from a misplaced sense of friendship and loyalty to parties that did not have her best interests, or anyone else's for that matter, at heart.  I believe she has grown from her mistakes, and deserves the opportunity to rebuild her life.  I feel that her mistakes are just that, mistakes, and I hope you will take this into consideration.

Thank you,

Jon Wadsworth

4541 45th Street, N.W.
Washington, D.C. 20016


December 3, 2007


The Honorable Ellen Segal Huvelle
Judge
United States District Court
    for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Huvelle:

I write this letter for your consideration in connection with the sentencing proceedings for Italia
Federici.

I am a member of the District of Columbia bar, and have been an active conservation
professional in federal and state government, the non-profit sector, and in private practice since
1969, including a term as Executive Director of the Sierra Club and Secretary for Resources in
California. I have known Ms. Federici since returning to Washington from Sacramento in 1999,
when she first became Executive Director of the newly-organized Council of Republicans for
Environmental Advocacy (CREA) and invited my participation in its activities.

As a member of CREA, I had the opportunity to interact with Italia, and to participate in events
which she organized to advance CREA's positions on important environmental issues. These
included briefings by members of the Legislative and Executive branch, discussions of
international issues with embassy personnel, and activities intended to attract media attention to
CREA's environmental agenda.

Throughout these many activities, involving senior legislators, government officials, diplomats,
and journalists, Italia performed her duties skillfully, and with appropriate respect for the
opinions of others. Working with a small staff and limited resources, she served as a very
effective advocate for positions which—though entirely reasonable—were not always consistent
with Washington's "conventional wisdom" on environmental issues. Nonetheless, Italia worked
with grace and deference to others' views, and comported herself in an entirely professional
manner. Due largely to Italia's efforts, CREA soon became recognized as a credible voice for
market-based solutions to environmental problems.

The Honorable Ellen Segal Huvelle
December 3, 2007
Page 2

Like most of her friends and colleagues at CREA, I was unaware of the activities which have
brought her to your Court, and—in light of her otherwise laudatory performance-- surprised to
learn of them.  In reviewing these comments, I hope you'll come to understand that there is an
important and admirable aspect of Italia's professional and personal life which has not been
reported by the media.   I respectfully submit that Italia's more positive contribution to public
dialogue should be weighed in the balance when determining the sentence to be imposed for her
less commendable activities of recent months.

Sincerely,

Douglas P. Wheeler



# United States Senate

# Senator Ben Nighthorse Campbell

## COLORADO

### Facsimile Cover Sheet

Date: _11/16/98_

TO: _Dtalia_

Destination Fax: _202 785 0261_

From: _James_

Number of pages to follow _1_

Comments: _Call me when you're in town_

---

☐ **380 Russell Senate Office Building**
  Washington, D.C. 20510
  **(202) 224-5852**
  **(202) 224-1933 fax**

☐ **1129 Pennsylvania Street**
  Denver, CO 80203
  **(303) 866-1900**
  **(303) 866-1919 fax**

☐ **105 East Vermijo, Suite 410**
  Colorado Springs, CO 80903
  **(719) 636-9092**
  **(719) 636-9165 fax**

☐ **720 Mail Street**
  Suite 402
  Pueblo, CO 81003
  **(719) 542-6987**
  **(719) 542-2515 fax**

☐ **19 Old Town Square**
  Suite 238, #42
  Fort Collins, CO 80524
  **(970) 224-1909**
  **(970) 224-1948**

☐ **300 Main Street**
  Suite 306
  Grand Junction, CO 81501
  **(970) 241-6631**
  **(970) 241-8313 fax**



# Coalition of Republican Environmental Advocates

370 17th Street, Suite 4950 • Denver, Colorado 80202
www.gop4environment.org

1320 18th Street, N.W., Suite 200 • Washington, D.C. 20036
202.547.2441 tel    202.785.0261 fax

| Gale A. Norton | Italia Federici | Grover G. Norquist |
|---|---|---|
| *National Chairman* | *President* | *National Co-Chairman* |

November 10, 1998

Secretary of the Interior
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Dear Mr. Secretary:

It has come to our attention that the Department of the Interior (DOI) is engaged in environmentally damaging action in the Florida Everglades Agricultural Area (EAA). The purchase of the Talisman properties in a manner unsupported by the State of Florida and without the benefit of an environmental impact statement (EIS) or economic impact analysis violates the spirit of the National Environmental Policy Act of 1969 (NEPA). By sidestepping proposals put forward by the South Florida Water Management District (SFWMD), and by unjustifiably underestimating the environmental and economic impact of the project, future Everglades restoration plans will be placed in jeopardy.

The Coalition of Republican Environmental Advocates is opposed to any action by the DOI regarding this matter that does not include preparation of an EIS and blithely inserts the federal government into matters best resolved by state and local authorities. It is the federal government's long and irresponsible history of exempting itself from environmental regulations that make it the single largest polluter in the country. Furthermore, DOI's apparent lack of concern for the socioeconomic needs of the community currently supported by the Talisman properties is alarming. While an economic impact analysis is required by NEPA, simple decency dictates that this study be completed before any further action is taken.

There is a proposal by the SFWMD / EAA and endorsed by the State of Florida, which has already been presented to your agency. The Coalition of Republican Environmental Advocates requests your support for this proposal as the best option for Everglades restoration and the most effective means for accomplishing that goal.

The Honorable Ben Nighthorse Campbell
United States Senator
Founding Member, CREA

Italia Federici
President, CREA



Cabor Environment
A L L I A N C E

2117 L Street, NW, Box 329  ·  Washington, DC 20037  ·  ph (202) 547-2128  ·  fx (202) 547-2129  ·  email@lea.com

## LEA Issues Overview

**Pro-Jobs Emissions Reduction and Climate Change Policies** – The Clear Skies initiative, taken as a whole, is a blueprint for improving the environment while promoting job creation. Using a market-based approach to reduce emissions of three major pollutants – nitrogen oxides, sulfur dioxide, and mercury – will ensure the continued viability of the energy industry and the jobs it provides, while at the same time improving air quality. In addition to Clear Skies, a voluntary program focusing on greenhouse gas intensity is critical: It sets a goal for greenhouse gas emissions that accounts for production of goods and services, while accommodating economic growth. Unlike programs that mandate reductions in domestic concentrations of greenhouse gases, this approach will not result in the loss of jobs in the U.S. In addition, it does not further exacerbate environmental challenges by exempting developing countries from enforceable limits.

**Green Roads** – While mass transit is an important component of many transportation strategies, road construction can produce environmental benefits. Building new roadways, along with improving existing roads and related infrastructure, has been proven to reduce overall automobile emissions by easing congestion and shortening drive times. Environmentally friendly construction practices, materials, and planning strategies, increase the attractiveness of road-based approaches, as does the fact that road projects often require less time and funding than alternative transportation solutions. New roads – free from potholes and other flaws common to older highways – and leading edge fuel technologies work together both to maximize energy efficiency and reduce emissions. In addition, better roads will minimize runoff, which is vital to the protection of watersheds.

*(over)*

**DOMESTIC ENERGY AND NATURAL RESOURCE MANAGEMENT** – The United States has the most stringent and environmentally responsible standards in the world when it comes to the exploration and development of energy resources. Increasing domestic supply of traditional energy sources such as oil, natural gas, and clean coal, will improve the global environment by taking advantage of the United States' vastly superior technology, ingenuity, workplace safety protections, and environmental resource management. In addition, the heavily unionized workforce in the energy sector ensures that the exploration, development, and management of traditional fuel projects is conducted with the highest degree of care and expertise.

**BROWNFIELDS REDEVELOPMENT** - Brownfields are a blight on urban centers and frequently contribute to local air pollution and groundwater contamination. With revitalization, these sites become productive businesses, stimulating the local economy through increased tax revenue and job creation. They can also be reclaimed for recreational uses. This type of land recycling reduces the need to develop virgin greenfields and other rural spaces, and reduces traffic congestion by bringing vitality to city centers.

1 of 2 DOCUMENTS

Copyright 2003 Bulletin Broadfaxing Network, Inc.
The White House Bulletin

April 16, 2003 Wednesday

**SECTION:** IN THE WHITE HOUSE AND AROUND TOWN

**LENGTH:** 396 words

**HEADLINE:** Teamsters, Republican Environmentalists Form Labor Environment Alliance To "Promote Jobs, Protect The Earth."

**BODY:**

International Brotherhood of Teamsters General President Jim Hoffa and Douglas Wheeler, a veteran environmentalist representing the Council Of Republicans for Environmental Advocacy, this morning announced the formation of the Labor Environment Alliance (LEA), which the LEA said is aimed "at promoting economic development and new jobs while protecting the environment."

At a news conference to launch the LEA, Hoffa said, "LEA will promote responsible environmentalism that walks hand in hand with job creation. It will recognize politicians who have taken a tough stand for the environment and for labor. I know that, as Americans, we can create jobs without damaging our environment. There are those who say that we can do either one or the other. I say they lack faith in our abilities -- and they are wrong." An LEA statement added, "The heavily unionized workforce in the energy sector ensures that the exploration, development and management of traditional fuel projects is conducted with the highest degree of care and expertise."

Wheeler, a Washington attorney who has held executive positions at the Sierra Club, American Farmland Trust and World Wildlife Fund, added, "This alliance between labor and environment will put to rest once and for all the false notion that we must choose between jobs and quality of life." He added in a statement, "LEA's priority issues include, among other things, the employment of our American workforce to meet the challenges of reducing greenhouse gas emission and improving air quality, and building Green Roads that minimize runoff, maximize fuel efficiency and incorporate leading edge transportation and fuel technologies."

He added, "The group agreed that the (President Bush's) Clear Skies Initiative, taken as a whole, is a blueprint for improving the environment while promoting job creation. In addition to Clear Skies, a voluntary program focusing on greenhouse gases is critical." Wheeler said the LEA would also support increased US energy production to take advantage of the nation's "vastly superior technology, ingenuity, workplace safety protections and environmental resource management." He added LEA would promote "Brownfields redevelopment," a step he said "reduces the need to develop virgin greenfields and other rural spaces, and reduces traffic congestion by bringing vitality to city centers."

**LOAD-DATE:** April 16, 2003